**Thomas F. BENNIS, Roger J. MacLean**

v.

**Carson S. GABLE, Joseph S. Daddona, City of Allentown, Appellants.**

No. 86–1596.

United States Court of Appeals, Third Circuit.

Argued March 17, 1987.

Decided July 6, 1987.

Rehearing and Reharing In Banc Denied July 30, 1987.

Edward C. McCardle (argued), King, McCardle, Herman & Freund, Allentown, Pa., for Carson S. Gable.

Alan M. Black (argued), Black, Epstein, Prokup & McCarthy, Allentown, Pa., for Joseph S. Daddona and City of Allentown.

James T. Huber (argued), Allentown, Pa., for appellees.

Before HIGGINBOTHAM, MANSMANN, and ROSENN, Circuit Judges

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal raises a number of close questions growing out of the trial of a political patronage suit brought by the plaintiffs, two Allentown, Pennsylvania, policemen, against the Mayor, the Chief of Police, and the City of Allentown. Plaintiffs' theory at trial was that the defendants had violated the plaintiffs' constitutional and federal civil rights by demoting them from detective-sergeants to patrolmen in retaliation for their support of Mayor Daddona's political opposition in the 1977 and 1981 mayoral elections. Alternatively, the plaintiffs argued that they were demoted to make room for Daddona's political supporters. Although the interests at stake were important and the evidence considerable, we conclude that the district court impermissibly trespassed upon the jury's fact-finding function when it instructed that, as a matter of law, the plaintiffs had engaged in protected first amendment activity. We therefore vacate the district court's judgment and remand for a new trial. Further, although mindful of the general rule that an appellate court will not decide questions not necessary to a determination of the case, because several of the issues raised by this appeal are almost certain to resurface in a new trial, we discuss those issues as well.

## I.

Joseph Daddona, a Democrat, was first elected mayor of the City of Allentown in 1973. As his chief of police, Daddona retained Carson Gable, then a Republican and chief of police under the former Republican administration. The plaintiffs, Thomas Bennis and Roger MacLean, were both hired as police officers in 1974, through a civil service hiring procedure.

Both plaintiffs claim to have known Daddona and Gable, and Bennis claims that his family had been neighbors and early supporters of Daddona. Bennis claims that a fallout between the families occurred sometime in 1976, and both plaintiffs allege that they supported the Republican candidate, Frank Fischl, in his successful unseating of Daddona in the 1977 mayoral election. As we shall develop further, the question of whether the plaintiffs did indeed actively support Fischl, or even whether they refused to support Daddona, was one of fact for the jury to decide.

In 1979 Bennis, along with fourteen others, applied for a promotion to the position of detective-sergeant. There were two positions available, and after reading all fifteen resumes and interviewing the six most promising candidates, a committee selected Bennis to fill one of the two available slots. MacLean also was promoted to the position of detective-sergeant in November 1981, after assisting the detective bureau in a child homicide investigation.

Daddona successfully ran in the 1981 democratic primary to regain the mayoralty, and was eventually elected in the November 1981 general election. At trial, both plaintiffs claimed to have supported Daddona's opposition in both elections. In particular, they claimed to have supported Democrat Louis Hershman in the primary election, and Republican Robert Smith in the general election. One of the major campaign issues, according to Daddona, was the lack of efficiency and low morale of the police department under Arthur Allender, who had succeeded Gable in the position of police chief in 1977.

Plaintiffs Bennis and MacLean testified that they first suspected on May 31, 1981, and early June 1981, respectively, that their alleged opposition to Daddona would have an impact upon them. Bennis testified that on May 31 Richard Zeller, an Allentown police officer, told him that the previous day Richard Gerencher, another Allentown police officer and son-in-law of

Carson Gable, had been arguing with James Spang, head of security at the Allentown Fairgrounds. Apparently, Zeller overheard Gerencher tell Spang that "when Daddona comes back, heads are going to roll, your friends Bennis and MacLean are going to take a tumble."[1] MacLean testified that he became aware of the incident when Bennis told him about it a few days later.

After Daddona's 1981 election, Gable, by now a registered Democrat, reassumed his duties as chief of police. Gable testified that shortly after the election Daddona asked him to make specific recommendations as to how to improve morale in the police department, and that in response to this request he made recommendations on, *inter alia*, demotions, reassignments of people, changes in platoon structure, and the addition of a night patrol. Most, though not all of Gable's recommendations were accepted by Daddona and in the end, twenty-four of 126 officers on the force were affected. Of the twenty-four, six, including the plaintiffs, were demoted. Nine demotions had been recommended.

Gable stated his reason for recommending plaintiffs' demotions in a January 1982 memorandum to Daddona:

> There is every reason to believe that their conduct, individually and collectively, has been reprehensible on duty and off. This conduct led to public criticism of the Police Bureau and created a schism of our sworn officers which can never be tolerated. Morale is at a new low, and understandably so.

With respect to two other officers, Gable stated:

> These men were promoted the last week in November 1981 and together with Roger MacLean (above) was simply a last ditch effort to help friends.

As a result of their demotions, plaintiffs' salaries were reduced by five and six percent, and they lost potential overtime.

After a six-day trial, the district court instructed the jury that as a matter of law the plaintiffs had engaged in protected first amendment activity, and submitted special interrogatories on other issues. The jury then found for the plaintiffs, specifically finding that plaintiffs' "political beliefs, expressions, and associations" were a "substantial or motivating factor" in their demotions, and that the defendants had not established by a preponderance of the evidence that the plaintiffs would have been demoted even if they had not engaged in protected activity. The jury also found that the actions of the individual defendants were an official act or policy of the City of Allentown, and awarded separate damages as follows: Bennis v. City, $30,000 compensatory; Bennis v. Daddona, $30,000 compensatory and $100,000 punitive; Bennis v. Gable, $15,000 compensatory and $40,000 punitive; MacLean v. City, $18,000 compensatory; MacLean v. Daddona, $26,500 compensatory and $100,000 punitive; MacLean v. Gable, $13,500 compensatory and $40,000 punitive.

The defendants presented timely motions for directed verdicts at the close of plaintiffs' evidence and again at the close of trial, both of which were denied.[2] Defendants' post-trial motions under Fed.R.Civ.P. 50(b) and Fed.R.Civ.P. 59 were similarly denied by the district court in an exhaustive memorandum opinion. Then, following the denial of the post-trial motions, the district court ordered, in another memorandum opinion, that Bennis be reinstated[3] and that both plaintiffs' seniority rights be adjusted. The court also awarded $87,505.50 in attorney's fees, a figure arrived at by doubling the lodestar, at least in part because of the risk involved.

---

1. Counsel's hearsay objection to this testimony was withdrawn when opposing counsel offered to present direct evidence from other witnesses later in the trial. Both Zeller and Spang did indeed later so testify.

2. Before trial, the district court granted a portion of defendants' summary judgment motion, dismissing plaintiffs' due process claims, but not

their first amendment claims. *See Bennis v. Gable,* 604 F.Supp. 244 (E.D.Pa.1984).

3. MacLean had been restored to the position of detective sergeant in 1984, approximately two years after placing sixth out of approximately fifty on a test for sergeant and/or equivalent.

## II.

In the course of instructing the jury that it was the plaintiffs' burden to establish that their activity was entitled to first amendment protection, the district court correctly explained that the plaintiffs' activity was entitled to first amendment protection if "it came within the guaranty of freedom of political belief, expression and association...." [4] *See Branti v. Finkel,* 445 U.S. 507, 513–17, 100 S.Ct. 1287, 1292, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 355–60, 96 S.Ct. 2673, 2680–83, 49 L.Ed.2d 547 (1976). The trial judge further charged, however:

> I have concluded, Members of the Jury, as a matter of law that plaintiffs Bennis and MacLean engaged in protected first amendment activity. This activity included opposing Mayor Daddona and supporting his opponent in both 1981 and 1977 and associating with both other police officers who oppose Daddona and the prior administration.

On appeal, the defendants contend that this charge constituted error and assert, *inter alia,* that the nature of the plaintiffs' alleged private conversations and associations, if any, were controverted questions of fact.

■ As a general rule, we will review a district court's rulings on points for charge under the abuse of discretion standard. *Link v. Mercedes-Benz of No. Am., Inc.,* 788 F.2d 918, 922 (3d Cir.1986). Once an instruction has been given, however, our standard of review changes. At that point, we generally ask ourselves whether, viewed in light of the evidence, the charge as a whole fairly and adequately submits the issues in the case to the jury, and reverse "only if the instruction was capable of confusing and thereby misleading the jury." *Id.* (quoting *United States v. Fischbach & Moore, Inc.,* 750 F.2d 1183, 1195 (3d Cir.1984), *cert. denied,* 470 U.S. 1029, 105 S.Ct. 1397, 84 L.Ed.2d 785 (1985)). On the other hand, a party who does not clearly and specifically object to a charge he believes to be erroneous waives the issue on appeal, unless the error was so "fundamental and highly prejudicial" as to constitute plain error, *see Bowley v. Stotler & Co.,* 751 F.2d 641, 647 (3d Cir.1985); *Batka v. Liberty Mut. Fire Ins. Co.,* 704 F.2d 684, 690 (3d Cir.1983) (quoting *Ostrov v. Metropolitan Life Ins. Co.,* 379 F.2d 829, 838 n. 10 (3d Cir.1967)), or unless the instruction was such "that the jury [was] without adequate guidance on a fundamental question and our failure to consider the error would result in a miscarriage of justice." *Bowley,* 751 F.2d at 647 (quoting *United States v. 564.54 Acres of Land, More or Less,* 576 F.2d 983, 987 (3d Cir.1978), *rev'd on other grounds,* 441 U.S. 506, 99 S.Ct. 1854, 60 L.Ed.2d 435 (1979)).

### A.

■ In the instant action, the plaintiffs asserted during oral argument before this court that the question of whether political activities actually occurred is "lawyer created," and does not "arise naturally from the facts of this case." According to the plaintiffs, the controverted issue at trial was not whether speech actually occurred; but rather, whether the speech which did occur was entitled to first amendment protection. They therefore argue that the defendants, "[h]aving not raised the issue at trial," waived it. The defendants, on the other hand, maintain that their current ob-

---

**4.** We therefore reject the defendants' suggestion that the district court's charge on association "was fraught with ambiguities" because it left unclear whether or not the word "political" was intended to modify the word "association." In the context of this case, the charge, taken as a whole, was quite clear. Indeed, directly following its first use of the phrase, "political belief, expression, and association," the district court referred to these rights as protecting *"political* activity." (Emphasis added). Further, we also reject the defendants' suggestions that plaintiffs'

alleged associations were not political because the plaintiffs were opposing a fellow Democrat, and that the plaintiffs' associations *necessarily* had to be political in order to be entitled to first amendment protection. The first amendment protects the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. United States Jaycees,* 468 U.S. 609, 622, 104 S.Ct. 3244, 3252, 82 L.Ed.2d 462 (1984). Of course, only the right to associate for political purposes is at issue in this case.

jection was fully preserved.[5] We believe the record in this case supports the defendants' interpretation of their objection.

If taken out of context, the parties' various requested points for charge, as well as their objection to the charge actually given, do appear to contain some latent ambiguity. For example, the defendants' fifteenth point for charge requested an instruction that the plaintiffs had the burden of proving "[t]hat the[y] engaged in constitutionally protected conduct," and "[t]hat Mayor Daddona had actual knowledge that they were engaged in this protected activity." The plaintiffs opposed this charge, stating, *inter alia*, that "[a]s a matter of law, the Plaintiffs engaged in constitutionally protected conduct." Although the plaintiffs' counter-proposal does not appear in the record, the defendants opposed it on the ground that "[p]laintiffs must prove that each Plaintiff individually engaged in protected speech...." Finally, after the disputed charge was given, the defendants made the following objection:

> You made a statement that as a matter of law the Plaintiffs had engaged in protected activity. One of the issues as far as the defense was concerned was whether they did, in fact, engage in any protected activity; whether or not that is really just an excuse for their putting forth to get past the morale problem and the matter dealing with the clique, et cetera, et cetera. So I take exception to the Court's directing that as a matter of law they did, in fact engage in protected activity when I think the question is whether engaged in protected activity at all [sic] is a Jury question.

Again, the asserted ambiguity, according to the plaintiffs, is whether the defendants were objecting to a finding that the plaintiffs' activities were protected, or whether they were objecting to a finding that the plaintiffs' alleged activities actually occurred at all.

The district court apparently understood the thrust of counsel's objection as challenging that the *status* of speech as protected or unprotected was a matter of law. Indeed, it is this understanding which accounts for the district court's heavy reliance upon *Czurlanis v. Albanese*, 721 F.2d 98 (3d Cir.1983). *Czurlanis* merely holds that where the delivery and substance of a speech is undisputed, its status as protected or unprotected is a question of law. *Czurlanis* does not address the question raised here by the defendants as to what in fact was the nature of the plaintiffs' alleged conversations and activities—were they, as claimed by the plaintiffs, related to Daddona's mayoral campaign, or were they, as claimed by the defendants, related to the intimidation of police officers and undermining of the police force?

In response to defendants' objection, the trial judge stated:

> There is no doubt in my mind their activity was entitled to First Amendment protection. I hedged it and explained that, and the interrogatories clearly delineate what the Jury's function is. And I decline to make any change in that ruling. I think it was a correct ruling considering my charge as a whole and considering my interrogatories.

Nevertheless, the district court's understanding can hardly be considered dispositive if the objection was sufficiently clear, *see, e.g., Bowley v. Stotler & Co.*, 751 F.2d at 646–47, and in the context of this case we conclude that the defendants' objection was sufficient to put the district court on notice that the *nature* of plaintiffs' activity, *if any*, was a disputed issue of fact.

During the course of the trial, the defendants consistently maintained that they were unaware of any political activity by the plaintiffs, and that the plaintiffs' assertion of political activity was "just an excuse" for having been demoted. Indeed, at one point Daddona even testified that, "[i]f anything, I would have assumed they were supporting me." Rather, the defendants' theory of the case was that the plaintiffs were members of a disruptive "clique," and that as far as the defendants were concerned the only "activities" in which the

---

**5.** Interestingly, it appears that the parties to this action were so busy filing motions, that no one ever noticed that the defendants failed to file a formal answer to the plaintiffs' complaint.

plaintiffs had engaged involved destroying morale by threatening and intimidating fellow officers. For example, the defendants presented the testimony of Officer Donald Layton, who testified that Bennis had threatened to "get even" with him for having filed a grievance relating to overtime, and that both Bennis and MacLean were members of a clique, the reputation of which "wasn't very good." Similarly, the plaintiffs presented evidence which appears to undercut their own assertion of having engaged in political activity. According to Bennis, the extent of the plaintiffs' political activity was severely restricted by the City's Code of Ethics:

> I could not campaign actively. I couldn't take out any petitions, or I couldn't be around the polls handing out literature, make telephone calls or things of that nature. I couldn't actively take part in anything.

When asked what it was he could do, Bennis replied, "[e]xactly what I did, just speak my mind."

Although we recognize that most of this testimony also went to the issue of whether the defendants *knew* of the plaintiffs' alleged activities, the testimony was also relevant to the defendants' theory that the plaintiffs' assertion of *political* activity was "just an excuse." Viewed from this perspective, even the plaintiffs' characterization of the defendants' objection would have preserved the issue now on appeal: even assuming that some type of activity did occur, there was a question of fact as to whether that activity was of a political nature or whether that activity was totally unrelated to politics.

**B.**

Questions of fact can only be properly decided by a jury. The court's instruction, however, impermissibly "took from the jury the overriding issue" as to the nature of the activity which the plaintiffs claimed substantially motivated the defendants in demoting them. *Chalonec v. Mathiasen's Tanker Indus., Inc.*, 287 F.2d 929, 931 (3d Cir.1961). *See Dimick v. Schiedt*, 293 U.S. 474, 485–86, 55 S.Ct. 296, 300–01, 79 L.Ed. 603 (1935); *Russell v. Baccuss*, 707 F.2d 1289, 1293 (11th Cir.1983); *County of Maricopa v. Maberry*, 555 F.2d 207, 216–17 (9th Cir.1977). This relieved the plaintiffs of their burden of persuasion in an unfair way: it left no room for the jury to believe anything but that Bennis and MacLean had engaged in some kind of activity, and that the nature of this activity was political. *See United States v. Argentine*, 814 F.2d 783, 787 (1st Cir.1987). Only after the jury had determined the nature and substance of the plaintiffs' alleged activity could the court decide its status as protected or unprotected. *See Czurlanis v. Albanese*, 721 F.2d 98 (3d Cir.1983).[6] By instructing the jury that as a matter of law "plaintiffs Bennis and MacLean engaged in protected First Amendment activity," and that "[t]his activity included opposing Mayor Daddona and supporting his opponent in both 1981 and 1977 and associating with both other police officers who oppose Daddona and the prior administration," the district court assumed as verity questions of fact which were for the jury alone to find without any intrusion into the fact-finding process by the trial court: did the plaintiffs in fact oppose Daddona both in 1981 and

**6.** A proper jury instruction might therefore have read:

> Members of the Jury, it is up to you, as the sole finders of fact, to decide whether the plaintiffs engaged in any activity which might have caused their demotions. If you find that the plaintiffs did engage in activity which might have caused their demotions, then you must also determine the nature of that activity. If you find that the plaintiffs' activity was of a political nature, that is, if you determine that the activity consisted of or included opposing Mayor Daddona and supporting his opponent in both 1981 and 1977 and associat-

> ing with both other police officers who opposed Daddona and the prior administration, then, Members of the Jury, I charge you as a matter of law that plaintiffs Bennis and MacLean engaged in protected first amendment activity. If, however, you determine that the activity in which the plaintiffs engaged, if any, was unrelated to either Mayor Daddona's mayoral campaigns or other political considerations, but pertained to efforts to intimidate other police officers in the performance of their police duties, then I charge you that you must find for the defendants.

1977 and support his opponent, and did they in fact associate with other police officers in opposing Daddona and the prior administration?

Moreover, on the facts of this case we cannot ignore the inexorable link between knowledge of the plaintiffs' activities and the activities themselves. Given the plaintiffs' admittedly limited ability to do any active campaigning because of the City's Code of Ethics, and the defendants' vehement denials of any awareness of any political activities on the plaintiffs' part, absent the challenged district court's charge, the jury might well have concluded that the defendants never knew of plaintiffs' alleged political activities because the plaintiffs never engaged in any. Rather, the jury might have concluded that the only "activities" the plaintiffs had engaged in were those suggested by the defendants. Once the district court instructed the jury "as a matter of law that [p]laintiffs Bennis and MacLean engaged in First Amendment activity," however, the jury reasonably could have concluded that it need not focus on and sift the evidence pertaining to the defendants' knowledge. It would hardly be surprising if the jury concluded that because the court in effect stated that the plaintiffs had been truthful in asserting that they expressed their views as openly as they believed possible, the defendants must have known of those activities. From this stream of reasoning everything else naturally flowed—including a finding that plaintiffs' activities were a substantial or motivating factor in their demotions.

Finally, we also believe that the district court's basic error spilled over into and infected jury interrogatories one through four and six through nine, each of which either began "[d]o you find that the political beliefs, expressions, or associations of plaintiff...." or ended "... even in the absence of ... protected First Amendment activity." [7] These instructions again assumed that plaintiffs engaged in political activities. Had the jury been free of the constrictive instruction relating to plaintiffs' claimed political activity, the jury might have believed that Bennis and MacLean's assertions of political activity were made of whole cloth. Once the court instructed that these activities occurred, however, the jury was severely limited in favor of rejecting the defendants' theory of the case and accepting the plaintiffs'. Accordingly, although we conclude that in light of the testimony counsel's objection was sufficient to preserve the defendants' appeal, even if counsel's objection had not sufficiently preserved the issue on appeal, the error in this case was fundamental and highly prejudicial, and the jury was without adequate guidance on a fundamental question so that our failure to consider the error would result in a miscarriage of justice. *See Bowley,* 751 F.2d at 647; *564.54 Acres of Land,* 576 F.2d at 987; *Pritchard v. Liggett & Myers Tobacco Co.,* 350 F.2d 479, 486 (3d Cir.1965) (where it is apparent that counsel's failure properly to protect his client's interest by timely objection may have resulted in miscarriage of justice, error will be reviewed.), *cert. denied,* 382 U.S. 987, 86 S.Ct. 549, 15 L.Ed.2d 475 (1966).

### III.

Although our conclusion that the district court committed reversible error in its instruction on protected activity makes it unnecessary for us to reach many of the issues raised by the defendants, some of these issues are almost certain to recur on remand in the district court. Therefore, we will briefly address those issues.[8]

---

7. For example, interrogatory four asked, "Do you find that defendant Daddona would have demoted Thomas F. Bennis even in the absence of Bennis' protected activity?"

8. Among the defendants' various claims is an assertion that the district court erred in instructing the jury that the defendants' burden was to prove the existence of, adverse effect of, and plaintiffs' participation in a harmful "clique," rather than defendants' perception of the existence of a "clique." Although this claim appears strong to us, we are constrained to note that it could not form the basis for an alternative holding, because other than a brief reference to perception in the pretrial order the point was never mentioned at trial, no request for a charge on perception was submitted to the court, and the issue was never raised during the

## A.

In its charge to the jury the district court not only ruled that as a matter of law plaintiffs' protected activity included speech and association, but that "[p]laintiffs also have the right not to be demoted in order to enable defendants to promote persons who support Daddona." This, argue the defendants, constituted error in two respects: (1) the plaintiffs only had the right not to be discharged, and not the right not to be demoted; and (2) the charge permitted a finding against the defendants even if the plaintiffs engaged in no political activity; it would have been enough to find that the plaintiffs were "bumped" to make room for political supporters. We reject these assertions of error.

### 1.

In *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Supreme Court held that where a government benefit is conditioned upon forfeiture of a constitutional right, the district court must use a balancing test to determine the constitutionality of the denial of the benefit. Then, in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the Court applied *Pickering* to discharges for political reasons and concluded that the interest of employees in not being discharged for exercising first amendment rights outweighed the interest of the government in efficiency. According to the defendants here, a *Pickering* balance in favor of the plaintiffs in a case involving only demotion and not discharge would constitute an unwarranted extension of *Elrod* and *Branti.* We disagree.

Although *Pickering, Elrod,* and *Branti* each involved dismissals from employment, the rationale of each dealt with the constitutionality of action adversely affecting an interest in employment in retaliation for an exercise of first amendment rights. As we read those cases, the constitutional violation is not in the harshness of the sanction applied, but in the imposition of any disciplinary action for the exercise of permissible free speech.[9] "The first amendment is implicated whenever a government employee is disciplined for his speech." *Waters v. Chaffin,* 684 F.2d 833, 837 n. 9 (11th Cir. 1982) (demotion and transfer). *See Robb v. City of Philadelphia,* 733 F.2d 286, 295 (3d Cir.1984) (transfer and refusal to promote); *Czurlanis v. Albanese,* 721 F.2d 98 (3d Cir.1983) (suspension).

### 2.

The defendants also assert that *Elrod* and *Branti* should not be extended to cover plaintiffs who were not demoted for political opposition; but rather, were demoted simply to make room for political supporters. The problem with this assertion, however, is that an alternative view of a demotion to make positions available for political supporters is that the demotion thus reflects a failure to support. A citizen's right not to support a candidate is every bit as protected as his right to support one. *See Roberts v. United States Jaycees,* 468 U.S. 609, 623, 104 S.Ct. 3244, 3252–53, 82 L.Ed.2d 462 (1984) ("Freedom of association ... plainly presupposes a freedom not to associate."). The defendants' citation to *Avery v. Jennings,* 786 F.2d 233 (6th Cir.),

---

charge conference or at the completion of the jury instructions. Accordingly, we reject it.

On a related note, the defendants also complain that the district court erred in excluding certain evidence concerning the clique. We do not reach this issue either, because we believe it is unlikely to resurface on remand, and we are in any event uncertain that any of the specific evidence excluded in this case was improperly excluded. Nevertheless, we note that it would be problematic were the district court on remand to conclude that the plaintiffs could attempt to prove a broad scheme of political reprisals through evidence only relevant to other

officers, but that the defendants could not attempt to prove a harmful clique through similar evidence. Otherwise proper evidence relevant to persons other than the principals in this action should be permitted as to either both or neither side.

**9.** Accordingly, to the extent it is inconsistent with this opinion we reject the Fourth Circuit's suggestion in *DeLong v. United States,* 621 F.2d 618, 623 (4th Cir.1980), that the rule in *Branti* should be confined to actions which are "the substantial equivalent of dismissal."

*cert. denied,* —— U.S. ——, 106 S.Ct. 3276, 91 L.Ed.2d 566 (1986), is, as the defendants even appear to concede, inapposite. In *Avery,* the selected persons filled vacancies; they did not replace persons already holding positions.

Finally, the defendants cite generally to this court's divided *in banc* judgment in *Horn v. Kean,* 796 F.2d 668 (3d Cir.1986) (in banc), in which some of the court criticized the *Elrod/Branti* rule, and interpreted it narrowly to apply only to public employees and not to independent contractors. The police, however, are public employees. Further, to the extent that *Horn* criticizes *Elrod/Branti,* and implies that the two cases should be interpreted narrowly, that criticism failed to attract a majority of the court. *See id.* at 679 (Seitz, J., concurring, and Garth, J. with whom Higginbotham, J., joined concurring); *id.* at 680 (Gibbons, J., with whom Sloviter, Mansmann, and Stapleton joined dissenting). Therefore, we conclude that the district court properly charged that the defendants could be found liable if they demoted the plaintiffs to fill positions for Daddona's political supporters.

### B.

The defendants also assert that it was error for the district court to charge that the plaintiffs' burden was to prove that politics was a "substantial or motivating factor" in their demotions. Instead, the defendants suggest that the appropriate charge would have been "substantial motivating" factor, or perhaps "substantial" factor with "motivating" as a defined alternative usage. According to the defendants, "[w]hen used in the disjunctive, the term[s] 'substantial' and 'motivating' provide the jury with an ambiguous standard and, depending upon the definition which the jury assigns to these terms, significantly lessens the appellees' burden of proof."

The defendants concede, however, that the "substantial or motivating factor" test is derived from the Supreme Court's opinion in *Mount Healthy School Dist. Bd. of Ed. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). Further, this Circuit has frequently indicated that the standard is "substantial or motivating." *See Johnson v. Lincoln University,* 776 F.2d 443, 454 (3d Cir.1985); *Czurlanis v. Albanese,* 721 F.2d 98, 103 (3d Cir.1983). We therefore decline to explore the nuances of the "substantial or motivating factor" language, and upset this well-established standard.[10]

### C.

The defendants next make two related arguments based essentially upon what they perceive to have been, at the time of their actions, the unsettled state of the law with respect to political patronage. According to the defendants, the unsettled state of the law made a grant of qualified immunity appropriate and any award of punitive damages inappropriate.

### 1.

Government officials are entitled to a qualified immunity from liability for damages if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known. *Mitchell v. Forsyth,* 472 U.S. 511, 517, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Harlow v. Fitzgerald,*

---

10. The defendants also contend that the district court erred in instructing the jury that the defendants knowingly did the acts alleged if the acts were done "voluntarily and intentionally and not because of mistake or accident or other innocent reasons." According to the defendants, this charge was confusing because "the action of Daddona in demoting plaintiffs was obviously an intentional act"; the instruction, it is argued, should have more clearly distinguished intentional retaliation for political beliefs (necessary to liability), from specific intent to violate the first amendment (not necessary to liability). Even if the court's instruction might have been clearer, the court's instruction on "substantial or motivating factor" and the jury's specific finding thereof, coupled with the related finding that the plaintiffs would not otherwise have been demoted, demonstrate that the jury must have found the requisite knowledge. Moreover, we note in passing that despite the defendants' claims to the contrary, the plaintiffs submitted more than sufficient evidence which, if believed, would have supported a finding that the defendants knew of the plaintiffs' alleged political activities.

457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1980). Borrowing heavily from their argument that the district court impermissibly expanded the *Elrod/Branti* rule, the defendants stress that while *Elrod, supra,* and *Branti, supra,* dealt with dismissal, the plaintiffs were only demoted; that *Robb v. City of Philadelphia, supra,* in which we reversed the district court and held a transfer to be protected, was not decided until 1984; that *Delong,* 621 F.2d at 623, suggested confining *Elrod/Branti* to "the substantial equivalent of dismissal;" and that *Horn v. Kean, supra,* gave this court trouble in applying the *Pickering* balancing test to an independent contractor. Although we agree with the defendants that the rule of *Elrod/Branti* is of comparatively recent vintage, and that its application has from time to time produced unpalatable consequences, we cannot, in good conscience, conclude that in 1982 a reasonably active politician would not have believed that it would be impermissible to demote an employee in retaliation for his political speech and/or associations.

In *People of Three Mile Island v. Nuclear Reg. Comm'rs,* 747 F.2d 139 (3d Cir. 1984), this court addressed the issue of analogous precedent in the context of ascertaining "clearly established" law for purposes of the qualified immunity defense, and rejected a requirement of strict factual identity in favor of a more balanced approach:

> The [Supreme] Court in *Harlow* [*v. Fitzgerald,* 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982) ] suggested that there must be some factual correlation [between applicable precedents and the case at issue], because an official may not be required "to anticipate subsequent legal developments" nor know that "the law forbade conduct not previously

identified as unlawful." . . . Some courts have required a relatively strict factual identity. . . . Other courts have insisted that officials know and apply general legal principles in appropriate factual situations. Although officials need not "predic[t] the future course of constitutional law," . . . they are required to relate established law to analogous factual settings. . . .

> We adopt this second approach—requiring some but not precise factual correspondence and demanding that officials apply general, well developed legal principles. . . . While we cannot expect executive officials to anticipate the evolution of constitutional law, neither can we be faithful to the purposes of immunity by permitting such officials one liability-free violation of a constitutional or statutory requirement. . . . Moreover, requiring officials to consider the legal implications of their actions should have a salutary effect.

*Id.* at 144–45 (citations omitted). Clearly, if retaliatory discharges, transfers, letters of reprimand, and demotions accompanied by transfers were all illegal as of 1982, it cannot be said that under our standard retaliatory demotions by themselves were not also clearly illegal. Indeed, this must particularly be the case where, as here, the demotions involved cuts in pay and the equivalent of a verbal reprimand through statements made to the newspapers. Accordingly, although the long history of political patronage, its popularization, and its legitimation in this country, perhaps makes the question a closer one, *see Elrod,* 427 U.S. at 353, 96 S.Ct. at 2679–80, we conclude that as of 1982 the law was "clearly established" that a public employee could not be demoted in retaliation for exercising his rights under the first amendment.[11]

---

**11.** It is undisputed that the City's sole authorized decision maker on promotions and demotions within the police department is the mayor, *see* 53 Pa.Stat.Ann. § 37002, and therefore if Daddona is ultimately held liable the City may be held liable as well. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, ——, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986) ("Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy

with respect to the action ordered.") On the other hand, if only Gable and not Daddona is held liable, then the City may not similarly be held liable. *See id.* at ——, 106 S.Ct. at 1297–99; *Monell v. New York City Dep't of Social Serv.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978).

Despite his protestations to the contrary, it appears clear to us that notwithstanding his lack of statutory authority Gable may be held liable

### 2.

■ Punitive damages are available in actions brought pursuant to 42 U.S.C. § 1983 not only where there was a malicious intent or evil motive, but also where the defendants acted with a "reckless or callous disregard of, or indifference to, the rights and safety of others." *Smith v. Wade,* 461 U.S. 30, 33, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983).[12] In what the plaintiffs have correctly characterized as essentially a "rehash" of the defendants' qualified immunity argument, *supra,* the defendants assert that "[w]ith the law on first amendment protected activity in such a state of flux, it is inconceivable that plaintiffs' reductions in rank, even if politi-

cally motivated, could be considered a reckless or callous disregard of any right." As we have already concluded, however, although a close question-especially in light of this nation's long history of rewarding political victors with the spoils of office— the law on first amendment protected activity was not in such a state of flux that the defendants can be said to have been reasonably unaware that they could not demote the plaintiffs in retaliation for their alleged activities. Accordingly, although the amount of the punitive damages actually awarded may well have been excessive,[13] we conclude that the district court did not err in submitting the issue of punitive damages to the jury.[14]

---

for his actions. As police chief, Gable acted under color of state law regardless of whether he had actual authority. Futher, even if Gable were correct in his assertion that the plaintiffs were required to show that he either "conspired" or "acted in concert" with Daddona, such allegations were specifically made in the plaintiffs' complaint, and the evidence the plaintiffs adduced at trial was sufficient to support the allegations. *See, e.g., Robb v. City of Philadelphia, supra.* Although true that the court gave no instruction to the jury on conspiracy, none was requested.

**12.** Nevertheless, the defendants argue that the punitive damages issue ought to be decided solely under a "malicious intent or evil motive" standard, because before *Smith* the law was unsettled. We disagree, and adopt the reasoning of the district court and of the *Smith* Court itself, that although the precise issue of the availability of punitive damages under § 1983 had never been before the Supreme Court prior to *Smith,* the Court had on numerous occasions made it clear that punitive damages were available in such actions. *See, e.g., Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981).

**13.** In view of our disposition of this appeal, it is unnecessary for us to decide the issue of the excessiveness of the damages, and we do not so decide. Nevertheless, we think it worth noting that the amount of the damages awarded may very well have been symptomatic of the erroneous jury charge and infected jury interrogatories, as well as the admission of evidence of political reprisals against non-plaintiff third parties. The jury awarded $133,000 in compensatory damages against three defendants, and $280,000 in punitive damages against Daddona and Gable personally, aggregating in total $413,000 exclusive of the plaintiffs' claim for attorneys' fees.

**14.** We reject the defendants' contention that evidence of their financial status was a prerequisite to the imposition of punitive damages. Although the wealth of the defendant, together with the size of the compensatory damage award, may be relevant to the imposition of punitive damages, *Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 269, 270, 101 S.Ct. 2748, 2761–62, 69 L.Ed.2d 616 (1981); *Acosta v. Honda Motor Co.,* 717 F.2d 828, 839 (3d Cir.1983), it can hardly be said that the defendants' financial status was an element of plaintiffs' cause of action to be proved before punitive damages could be awarded. Indeed, the Restatement (Second) of Torts § 908(2) (1979), to which the Supreme Court cites in *Newport* lists wealth as only a factor, which "can" be considered. The defendants here had every opportunity to present evidence of their financial worth and chose not to do so.

We also reject the defendants' contentions that the district court erred in instructing the jury on the proper apportionment of compensatory damages. Apportionment is appropriate whenever "a factual basis can be found for some rough practical apportionment, which limits a defendant's liability to that part of the harm which that defendant's conduct has been cause in fact." W. Prosser & W.P. Keeton, The Law of Torts, § 52, at 345 (5th ed. 1984) (cited in *McKinnon v. City of Berwyn,* 750 F.2d 1383, 1387 (7th Cir.1984)). "[G]eneral evidence as to the proportion in which the causes contributed to the result will be sufficient to support a verdict." *Id.* at 350. Similarly, we reject the suggestion that the instruction given was ambiguous or incomplete. The trial court clearly stated that compensatory damages could be awarded only once, and when the harm inflicted by separate torts does not lend itself to definite or satisfactory proof, apportionment may properly be left to the jury's estimate. *See id.* at 348–49 (and cases cited therein).

### D.

In awarding counsel fees to plaintiffs' counsel under 42 U.S.C. § 1988, the district court multiplied the lodestar by a factor of two in order to reflect the risk of loss, a practice that has been upheld in this circuit. *See Hall v. Borough of Roselle,* 747 F.2d 838, 842–43 (3d Cir.1984). The Supreme Court recently requested reargument on this precise issue in *Commonwealth v. Delaware Valley Citizens Counsel for Clean Air,* — U.S. —, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986), however, and reargument was heard on October 15, 1986. We do not decide this issue on this appeal because we expect that the Supreme Court's pronouncement will soon be forthcoming. On remand, however, we suggest that the district court hold resolution of the issue in abeyance until *Delaware Valley* is decided.*

### IV.

In conclusion, we hold that the district court impermissibly invaded the province of the jury when it instructed the jury that the plaintiffs had engaged in certain protected first amendment activities as a matter of law. Although the status of plaintiffs' alleged activities as protected or unprotected may have been a question of law, it was solely for the jury to decide whether or not such activities occurred, as well as the nature of those activities. Further, on the record before us we conclude that the testimony on the issue was sufficiently controverted and the objection to the charge adequate to make review by this court appropriate.

Accordingly, the judgment of the district court will be vacated and the case remanded for further proceedings consistent with this opinion.

---

* The Supreme Court's decision in *Commonwealth v. Delaware Valley Citizens Counsel for Clean Air* was released while this opinion was being circulated in the court for approval before filing. — U.S. —, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987).