**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-2891
_____

ERIC TRENT

v.

COUNTY OF SOMERSET; GERALD WALKER,
in his official and individual capacities,
Appellants
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 3-20-cv-00213)
District Judge: Honorable Stephanie L. Haines
_____

Argued on April 16, 2024

Before: HARDIMAN, SMITH, and FISHER, *Circuit Judges*.

(Filed: September 11, 2024)

Christopher P. Furman    [**ARGUED**]
Christopher P. Gabriel
Gabriel Fera
1010 Western Avenue, Suite 200
Pittsburgh, PA 15233
        *Counsel for Appellant*

John B. Dougherty    [**ARGUED**]
Ira H. Weinstock
800 N 2nd Street
Harrisburg, PA 17102

Ernest B. Orsatti
Quatrini Law Group
941 Penn Avenue
Pittsburgh, PA 15222
    *Counsel for Appellee*

_____

OPINION[*]

**FISHER**, *Circuit Judge*.

Eric Trent was employed by Somerset County in its maintenance department. He sued the County, alleging he was fired and criminally charged after speaking with County Commissioner Gerald Walker about concerns over the County's hiring practices. Trent alleges Walker and the county violated 42 U.S.C. § 1983 by retaliating against him for exercising his First Amendment rights. Walker moved to dismiss based on qualified immunity, and the District Court denied the motion. Walker appeals. We will affirm.[1]

"Every person," including a public official, "who subjects . . . any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

[1] The district court had jurisdiction under 28 U.S.C. §§ 1331 (federal questions) and 1343(a)(3) (actions to redress the deprivation of federal constitutional or statutory rights under color of state law). We have jurisdiction under 28 U.S.C. § 1291 (final decisions of district courts) because under the collateral order doctrine, an order denying a motion to dismiss based on qualified immunity is final and appealable. *Dennis v. City of Phila.*, 19 F.4th 279, 285 (3d Cir. 2021).

rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." 42 U.S.C. § 1983. But a public official is immune from suit when his or her "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam)). To determine whether an official is entitled to qualified immunity, "we ask (1) whether the officer violated a constitutional right, and (2) whether the right was clearly established, such that 'it would [have been] clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Lamont v. New Jersey*, 637 F.3d 177, 182 (3d Cir. 2011) (quoting *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001)).

## I. The county violated Trent's constitutional right to be free from retaliation for exercising his freedom of speech

To meet the first prong of the qualified immunity analysis—that is, to state a claim for First Amendment retaliation—Trent "must [allege] that (1) his speech is protected by the First Amendment and (2) the speech was a substantial or motivating factor in the alleged retaliatory action." *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 986 (3d Cir. 2014).

### 1. Trent's speech was protected by the First Amendment

Given the tension between employees' freedom of speech and the government's interest in maintaining a functioning workplace, "we conduct a three-step inquiry to

3

determine whether a public employee's speech is protected": (a) "the employee must speak as a citizen, not as an employee"; (b) "the speech must involve a matter of public concern," and (c) "the government must lack an 'adequate justification' for treating the employee differently than the general public based on its needs as an employer." *Id.* at 987 (quoting *Gorum v. Sessoms*, 561 F.3d 179, 185 (3d Cir. 2009)).

***Trent spoke as a citizen, not an employee.*** The difference between the two depends on the circumstances, not on "simple tests" such as where the speech took place or whether it relayed information the plaintiff knew because of his government employment. *De Ritis v. McGarrigle*, 861 F.3d 444, 453 (3d Cir. 2017). The key consideration is whether the plaintiff made the statement "pursuant to . . . official duties." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). If so, the plaintiff is "not speaking as [a] citizen[] for First Amendment purposes, and the Constitution does not insulate [those] communications from employer discipline." *Id.*

Here, Trent spoke to Walker outside the workplace during non-work hours, saying he disagreed with Somerset County's hiring practices.[2] These comments had nothing to do with Trent's job duties. While the complaint does not outline his duties, it specifies that he was "a maintenance employee" and allows us to infer that, among other things, he

---

[2] The facts we refer to reflect the allegations in the complaint, which we assume to be true and construe in the light most favorable to the plaintiff. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

4

made "urgent" repairs to county property. *Id.* at 22, 24. Maintenance and repair work does not relate to hiring. "[N]othing about [Trent's] position compelled or called for him" to speak to Walker about hiring practices. *See Dougherty*, 772 F.3d at 988. Therefore, Trent spoke as a citizen, not an employee.

***The speech involved a matter of public concern.*** "Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (quoting first *Connick v. Myers*, 461 U.S. 138, 146 (1983), then *San Diego v. Roe*, 543 U.S. 77, 83–84 (2004) (per curiam)) (citations omitted). The question is "whether [such] expression . . . is of value to the process of self-governance." *Azzaro v. Cnty. of Allegheny*, 110 F.3d 968, 977 (3d Cir. 1997). Speech relating "solely to mundane employment grievances does not implicate a matter of public concern." *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 467 (3d Cir. 2015), *as amended* (Oct. 25, 2019).

To address a matter of public concern, speech need not be public; "[p]rivate dissemination of information and ideas can be as important to effective self-governance as public speeches." *Azzaro*, 110 F.3d at 978. And speech that is "inappropriate or controversial" can address a matter of public concern because "'debate on public issues

5

should be uninhibited, robust, and wide-open.'" *Rankin v. McPherson*, 483 U.S. 378, 387 (1987) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). We do not consider "the merit of the view expressed or its source." *Azzaro*, 110 F.3d at 977.

Naturally, speech addressing a weighty policy matter will qualify. *Azzaro*, 110 F.3d at 978 (citing cases involving "[r]acial discrimination in the assignment of school personnel" and "allegation[s] of malfeasance by election officials"). But not-so-lofty speech can qualify too. "The First Amendment does not protect speech and assembly only to the extent it can be characterized as political. 'Great secular causes, with smaller ones, are guarded.'" *Connick*, 461 U.S. at 147 (quoting *United Mine Workers v. Ill. State Bar Ass'n*, 389 U.S. 217, 223 (1967)). For example, a caustic remark about the attempted assassination of President Ronald Reagan addressed a matter of public concern. *Rankin*, 483 U.S. at 381, 386 ("If they go for him again, I hope they get him."). So did hateful signs criticizing the United States, which were displayed outside a fallen soldier's funeral. *Snyder*, 562 U.S. at 448, 454 ("God Hates the USA/Thank God for 9/11," "God Hates Fags"). And so did a private complaint about sexual harassment. *Azzaro*, 110 F.3d at 979.

By contrast, an assistant DA's communication to coworkers about "office transfer policy, office morale, the need for a grievance committee, [and] the level of confidence in supervisors" did not address public concerns—only one topic, "whether employees felt

6

pressured to work in political campaigns," was a public concern. *Connick*, 461 U.S. at 141, 148–49.

Here, Trent spoke to Walker about what Trent perceived to be Somerset County's practice of preferentially hiring people from outside the county and state rather than local people. Significantly, during that conversation, Trent advised Walker, who was running for re-election, that he "would work to remove . . . Walker from office over the [hiring] issue." App. 23 ¶ 17. This "relat[es] to [a] . . . matter of political, social, or other concern to the community." *Snyder*, 562 U.S. at 453 (quoting *Connick*, 461 U.S. at 146). It is not a mundane workplace grievance; Trent was not complaining about how the maintenance department was run. *See Munroe*, 805 F.3d at 467. And the fact that Trent might have been motivated by self-interest, hoping to be promoted one day, does not eliminate the First Amendment's protection: "the speaker's motive . . . is not dispositive in determining whether a particular statement relates to a matter of public concern." *Azzaro*, 110 F.3d at 978 (noting that although the motive behind the employee's speech in *Connick*, 461 U.S. at 148, was to avoid a transfer, the speech was partly about a matter of public concern).

Local government matters, including who is hired, are not too small or parochial to be public concerns: both "[g]reat" and "smaller" causes are protected. *Connick*, 461 U.S. at 147 (quoting *United Mine Workers*, 389 U.S. at 223). It "is of value to the process of self-governance," *Azzaro*, 110 F.3d at 977, for a government employee to be able to

7

speak about government hiring to an elected official engaged in campaign-related activities. Therefore, Trent spoke on a matter of public concern.

***The County lacked an adequate justification for treating Trent differently than the general public based on its needs as an employer.*** We "balance . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Dougherty*, 772 F.3d at 991 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). The question is "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388. If "an employee serves no confidential, policymaking, or public contact role, the danger to the agency's successful functioning from that employee's private speech is minimal." *Id.* at 390–91.

Thus, a sheriff's office was not justified in firing a low-level data entry clerk with only internal responsibilities who made a harsh remark about the president privately to an office friend. *Id.* at 389. By contrast, "a First Assistant District Attorney's publicized comments disputing the veracity of the District Attorney's statements" was an "'irreparable breach of confidence' [that] completely precluded a functional working

8

relationship." *Dougherty*, 772 F.3d at 991 (quoting *Sprague v. Fitzpatrick*, 546 F.2d 560, 565 (3d Cir. 1976)).

Trent's case is at the pleading stage, so we have only his side of the story. Drawing inferences in the light most favorable to him, his conversation with Walker at the Mega Show would not disrupt maintenance department operations or impair discipline or working relationships. *See Rankin*, 483 U.S. at 388. A maintenance employee does not make policy or have contact with the public, so it is unlikely Trent's conversation with Walker compromised the maintenance department's "successful functioning." *Id.* at 390–91. In sum, the county lacked an adequate justification for treating Trent differently than a member of the public.

Trent thus meets our three-pronged test for government employee speech: he spoke as a citizen on a matter of public concern and the county lacked a justification for treating him differently than a member of the public. His speech was therefore protected by the First Amendment.

2. Trent's speech was a substantial or motivating factor in the county's alleged retaliation

To state a claim for First Amendment retaliation, a public employee must allege that the protected speech "was a substantial or motivating factor in the alleged retaliatory action." *Dougherty*, 772 F.3d at 986. Causation can be shown by "an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory

9

action," a "pattern of antagonism coupled with timing," or the allegations "as a whole." *Dondero v. Lower Milford Twp.*, 5 F.4th 355, 361–62 (3d Cir. 2021) (citations omitted).

Thus, there was no causation where five-plus months elapsed between the speech and the allegedly retaliatory elimination of the plaintiff's position, and where the record as a whole did not imply causation. *Id.* However, there was a causal link where the plaintiff was placed on a performance improvement plan "within days" of her protected activity, and where a positive performance review just a month prior meant that the record as a whole raised the inference of causation. *Starnes v. Butler Cnty. Ct. of Common Pleas*, 971 F.3d 416, 430 (3d Cir. 2020).

Here, Trent alleges retaliatory discharge. He spoke to Walker at the Mega Show on March 23, 2019; he was escorted out of his workplace by police on March 27; he had a pretermination hearing on March 29.[3] That same day, a criminal complaint was filed against him. And he was discharged from county employment. A discharge "within days" is the kind of suggestive timing that shows causation. *See Starnes*, 971 F.3d at 430.

\* \* \*

Trent meets the first of two prongs necessary to defeat qualified immunity. He has

---

[3] This was Trent's "*Loudermill* hearing," so called because *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), established a public employee's right to such a hearing. *See also Morton v. Beyer*, 822 F.2d 364, 367 (3d Cir. 1987) (discussing *Loudermill* hearings).

sufficiently alleged that his constitutional rights were violated because his comments to Walker at the Mega Show were protected by the First Amendment, and the comments were a substantial or motivating factor in his alleged retaliatory termination. *See Dougherty*, 772 F.3d at 986.

## II. Trent's constitutional right was clearly established

Prong two of the qualified immunity analysis asks "whether the right was clearly established, such that 'it would [have been] clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Lamont*, 637 F.3d at 182 (quoting *Saucier*, 533 U.S. at 201–02). How this second prong operates "depends substantially upon the level of generality at which the relevant legal rule is to be identified." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (internal quotation marks omitted). For example, it could be asserted in the abstract that any official action that violates the First Amendment violates the clearly established right to freedom of speech. *See id.* But logic like that would allow plaintiffs "to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability." *Id.* Therefore, the right must be clearly established "in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640.

This is not to say there must be "a case directly on point." *Thomas v. City of*

*Harrisburg*, 88 F.4th 275, 284 (3d Cir. 2023) (quoting *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam)). Cases with "'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, [but] they are not necessary . . . . [T]he salient question . . . is whether the state of the law . . . gave [the defendants] fair warning" that their actions were unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (quoting *United States v. Lanier*, 520 U.S. 259, 261 (1997)). "[E]xisting precedent must have placed the statutory or constitutional question *beyond debate*." *Zaloga v. Borough of Moosic*, 841 F.3d 170, 175 (3d Cir. 2016) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

Walker argues the District Court defined the right too generally. For our part, we observe that the District Court did not actually define the right at all. The most that can be gleaned from the opinion is that "the threat of dismissal, depending on its clarity and credibility, can form the basis for a claim of retaliation in violation of the First Amendment." *Trent v. Cnty. of Somerset*, No. 3:20-CV-213, 2022 WL 4465517, at *4 (W.D. Pa. Sept. 26, 2022). But that is not a definition of a right. A sufficiently specific expression of the right at issue would be: the right of a public employee to be free from retaliatory discharge for making statements to an elected official that were unrelated to

12

the public employee's job duties and critical of the official's policies.[4]

At the relevant time—in 2019, when Trent was fired—this right was clearly established. In 1968, the Supreme Court held that a teacher could not be fired for writing a letter to the editor critical of the school board's budget. *Pickering*, 391 U.S. at 574. In 1987, the Supreme Court held that a sheriff's office could not fire a clerical employee for making a harsh critical remark about the president. *Rankin*, 483 U.S. at 392. In 2014, we held that a school district could not fire an employee for speaking about the superintendent's corrupt contracting practices. *Dougherty*, 772 F.3d at 993. These cases clearly establish the right in question.

Despite this longstanding case law, Walker argues he "ha[d] no authority to act on his own" to fire Trent and could "only . . . influence others to act." Appellant's Br. 29. Walker argues that no case clearly establishes that someone without the authority to terminate employment can be liable for retaliatory discharge. He cites cases holding that where a defendant allegedly causes a third party to retaliate against the plaintiff, "[i]t is not enough that [the] defendant speaks critically of [the] plaintiff or even that defendant directly urges or influences the third party to take adverse action. Rather, defendant must

---

[4] Our dissenting colleague argues that we should not define the right at issue in the first instance. But just as our precedents do not require remand when a district court defines the right too broadly or too narrowly, *Michtavi v. Scism*, 808 F.3d 203, 206–07 (3d Cir. 2015), remand is not required where a district court does not define the right at all, *Kedra v. Schroeter*, 876 F.3d 424, 449 (3d Cir. 2017).

'threaten' or 'coerce' the third party to act." *McLaughlin v. Watson*, 271 F.3d 566, 573 (3d Cir. 2001); *Zaloga*, 841 F.3d at 176 (same). Walker argues there are no allegations he threatened or coerced anyone.

But Walker did not lack authority to terminate Trent's employment. Walker admits he was one of "three County Commissioners, and a majority vote is required to discharge an employee." Appellant's Br. at 23 n.5 (citing 16 P.S. §§ 501 *et seq.*). So Walker was part of the decision-making body that fired Trent. That distinguishes this case from the ones Walker relies on. *See McLaughlin*, 271 F.3d at 570 n.3, 574 (defendant United States Attorney urged Pennsylvania Attorney General to take adverse action against employees in the AG's office; United States Attorney had no authority to reassign the plaintiffs and no vote on their job status); *Zaloga*, 841 F.3d at 173 (defendant borough council president lobbied the county's Prison Board to not renew a prison healthcare contract, but the council president had no authority over, and no vote on, whether the contract would be renewed). Thus, in order to state a claim against Walker, Trent need not allege that Walker threatened or coerced others.

Besides the fact that Walker's cases are distinguishable, a case he does not cite establishes that liability does not necessarily rest solely with the decisionmaker. In *Bennis v. Gable*, a police chief recommended that a newly-elected mayor demote two police officers who had supported the losing mayoral candidate. 823 F.2d 723, 726 (3d Cir.

14

1987). The mayor, who had sole authority over police promotions and demotions, demoted the officers. *Id.* at 726, 733 n.11. The officers sued the mayor and the police chief for First Amendment retaliation. *Id.* at 725. The police chief argued that because he was not the decisionmaker, he could not be liable. *Id.* But it was "clear to us" he could. *Id.* The police chief "acted under color of state law regardless of whether he had actual authority," so he was not entitled to qualified immunity. *Id.* Therefore, *Bennis* clearly established, well before 2019, that even if Walker lacked authority to fire Trent (and he did not, as explained above), Walker acted under color of state law when he reported Trent to HR, presided over the meeting where Trent was fired, and voted in favor of firing him. Based on these allegations, Trent's right to be free from Walker's alleged retaliation in causing him to be fired was clearly established.[5]

---

[5] At oral argument, Trent's counsel stated that Trent alleged both retaliatory discharge and false prosecution. However, Trent's appellate brief centers on retaliatory discharge. To the extent he discusses false prosecution, he cites only one case to show that a right was clearly established: *Schleig v. Borough of Nazareth*, 695 F. App'x 26, 28 (3d Cir. 2017). The District Court also cited *Schleig* (along with one unpublished district court case) when discussing the allegedly false criminal charges. *Trent*, 2022 WL 4465517, at *5. *Schleig*, a not-precedential opinion, cannot clearly establish any rights. *Porter v. Pa. Dep't of Corr.*, 974 F.3d 431, 451 (3d Cir. 2020) (when determining whether a right is clearly established, a case's "not precedential status . . . renders it useless as precedent"). *Schleig* is also distinguishable, because the retaliation there consisted of several kinds of harassment, including death threats against the plaintiff. 695 F. App'x at 28. A reasonable official would not know there is a right to be free from false prosecution in Trent's circumstances because of *Schleig*'s discussion of retaliation in the form of harassment and threats of violence. *See Anderson*, 483 U.S. at 640.

15

## III. Conclusion

For the foregoing reasons, we will affirm.

_____

HARDIMAN, *Circuit Judge*, dissenting.

A proper evaluation of qualified immunity requires the trial court to define the constitutional right at issue with sufficient detail that "a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). As my colleagues note, "the District Court did not actually define the right at all." Maj. Op. at 12.

A panel of this Court has the discretion to define the right in the first instance. But where, as here, the District Court failed to apply the correct qualified immunity standard (or any standard), I think it more judicious to vacate and remand. *See Est. of Lagano v. Bergen Cnty. Prosecutor's Off.*, 769 F.3d 850, 859 (3d Cir. 2014). Because we are a "court of review, not of first view," *O'Hanlon v. Uber Techs., Inc.*, 990 F.3d 757, 763 n.3 (3d Cir. 2021), I would pursue that course here and remand with instructions to the District Court to define the right at issue. Only then can that court determine whether Walker is entitled to qualified immunity. I respectfully dissent.