

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-11-1997

# Azzaro v. Allegheny

Precedential or Non-Precedential:

Docket 95-3253

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Azzaro v. Allegheny" (1997). *1997 Decisions*. Paper 81.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/81

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————————

NO. 95-3253

———————————————

BEVERLY A. AZZARO

v.

COUNTY OF ALLEGHENY; TOM FOERSTER,
an individual and Chairman, Allegheny County Commissioners and
WAYNE FUSARO

BEVERLY AZZARO,
Appellant

———————————————

On Appeal From the United States District Court
For the Western District of Pennsylvania
(D.C. Civil Action No. 93-1589)

———————————————

Argued December 7, 1995

BEFORE:  STAPLETON, SAROKIN,* and ROSENN, Circuit Judges

———————————————

Reargued En Banc
December 2, 1996

BEFORE:  SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN,
         GREENBERG, SCIRICA, COWEN, NYGAARD, ALITO, ROTH,
         LEWIS, MCKEE and ROSENN, Circuit Judges

———————————————

(Opinion Filed    April 11, 1997 )

———————————————

Michael J. Healey (Argued)
Healey, Davidson & Hornack
429 Fourth Avenue
Law & Finance Building, 5th Floor
Pittsburgh, PA  15219
 Attorney for Appellant

———————————————————————————————————————————————

* Hon. H. Lee Sarokin heard argument before the original panel
  but retired from office prior to the en banc hearing.

1

Ira Weiss, County Solicitor
Robert L. McTiernan (Argued)
Assistant County Solicitor
Caroline Liebenguth
Assistant County Solicitor
Allegheny County Law Department
300 Fort Pitt Commons Building
445 Fort Pitt Boulevard
Pittsburgh, PA  15219
 Attorneys for Appellees

---

OPINION OF THE COURT

---

STAPLETON, Circuit Judge:

Plaintiff Beverly Azzaro worked for Allegheny County in various capacities from March, 1979, until June 19, 1992, when she was discharged from her position as marketing coordinator in the Allegheny County Department of Development.  Azzaro claims that her discharge was in retaliation for her reporting an incident of sexual harassment by an executive assistant to the County Commissioner.  The district court entered summary judgment against Azzaro.

We conclude that there was sufficient evidence from which a reasonable factfinder could conclude that there was a causal link between plaintiff's report of sexual harassment and her termination.  We also conclude that plaintiff's report of sexual harassment is constitutionally-protected speech.  We will reverse the district court and remand for a resolution of the remaining factual issues.

Because we are obligated on summary judgment to view the facts in the light most favorable to the nonmoving party, we will present Azzaro's version of the events leading up to her discharge. According to Azzaro, the chain of events that resulted in her termination began on June 11, 1991 -- just over a year before she was discharged -- when her husband, who was also employed by the County, had a verbal confrontation with employees of the County Department of Employee Relations regarding the manner in which the Azzaros' daughters were treated in connection with their applications for jobs as County lifeguards. The Director of the Department of Employee Relations reported the incident to Harry Kramer, who was an executive assistant to then-County Commissioner Tom Foerster, indicating that his employees were upset by Mr. Azzaro's behavior. Kramer instructed Wayne Fusaro, another of Foerster's executive assistants, to speak with Mr. Azzaro and request that he apologize. Fusaro spoke with Mr. Azzaro, and Mr. Azzaro apologized to the appropriate people.

Azzaro learned of these events a day or two later through her husband and a co-worker, Donna Brusco. She was told by the co-worker that Mr. Azzaro's job might be in danger as a result of the incident. Fearing for her husband's position and hoping to smooth things over, Azzaro went to Commissioner Foerster's offices to talk to Fusaro. Azzaro testified that, after she had entered Fusaro's office and seated herself, Fusaro shut the office door and pulled a chair very close to hers. He

then began pulling open the lapels of her blazer, saying "let me see." App. 120. She tried to hold the blazer shut, telling him to stop, and saying "[w]hat the hell is wrong with you," but he put his hand inside and pulled her blouse out of her slacks. App. 121. Azzaro continued to try to evade Fusaro, standing when he sat down and sitting when he stood. Suddenly, Fusaro unzipped his pants and put his hand inside the zipper. App. 122. Azzaro stood up and said loudly, "[a]re you nuts." Id. As soon as plaintiff "got loud," Fusaro "assumed . . . [a] professional attitude." App. 123. He sat down at his desk and took a phone call. After he hung up, he said, "Beverly, I want you to promise what happened here is never going to go any further." App. 124. Azzaro promised.

Allegheny County's policy regarding sexual harassment defines it as conduct "includ[ing] any unwelcome sexual advances, request for sexual favors, and other verbal, visual, or physical conduct of a sexual nature." App. 56. Under the terms of the policy, an employee who has been subjected to sexual harassment "should bring the matter to the immediate attention of his or her supervisor." Id. Following such a report, the County Equal Employment Opportunity Director is required to "promptly investigate . . . in as confidential a manner as possible" and to submit a report to the Director of Administration within thirty days. Id. It is the Director of Administration who is authorized to "take appropriate corrective action." Id.

Azzaro did not immediately report the sexual harassment incident with Fusaro to her supervisor. However, she did tell

4

her daughters of the incident on the day it occurred, and she told her husband and a friend the following day.  She and her husband decided at that time not to report the matter or pursue it further for fear that they could lose their jobs.

In October 1991, Azzaro did finally tell her supervisor, Tom Fox, of the incident.  She first brought the matter to Fox's attention at a party, during a discussion of Anita Hill's testimony at the Clarence Thomas confirmation hearings.  Fox expressed shock and urged Azzaro to report the incident and pursue it through the proper channels.  The following Monday, he called her into his office, asked her to repeat the story, and pressed her once again to report the incident to the Director of the Department of Development, Joe Hohman.  He told her that if she did not report it, he would be obliged to do so on his own.  Azzaro asked him not to do so, telling him, "I ... [am] scared for my job and my husband's job."  App. 163.

Subsequently, Fox told Hohman himself.  In so doing, he impressed upon Hohman that he was telling him in confidence and that Hohman should not take any action unless he felt that he had an obligation to do so as director of the department.  Hohman told Fox that if Azzaro wanted to pursue the matter, she would have to report to him directly.

Meanwhile, Hohman was growing concerned that his relationship with Commissioner Foerster was deteriorating because Foerster no longer sought his input or advice.  Hohman scheduled a meeting with Commissioner Foerster in December, 1991 to address

5

these concerns.  Foerster invited his executive assistants, Fusaro and Kramer, to attend.  During the course of the meeting, Hohman stated that he "had problems with the people [Foerster] was surrounding himself" with, such as Wayne Fusaro.  Hohman testified that he said at the meeting,

> Wayne Fusaro ... potentially has a sexual harassment case coming against him from an employee in my office who I cannot name because the employee has not given me permission to name, but it occurred right upstairs in this office, Commissioner, over a summer job for her daughters.

App. 361-62.  Both Foerster and Kramer offered a slightly different account, testifying that Hohman mentioned a possible lawsuit against Fusaro but did not say that it concerned allegations of sexual harassment or offer any other details regarding the incident or the alleged victim.  However, both men have testified under oath in a related case that Hohman accused Fusaro of sexual harassment at that meeting.  App. 306, 433.[1]

Just as this meeting was taking place, Azzaro reported the harassment incident to the County Director of Administration, Sal Sirabella, the official ultimately responsible for reviewing reports of sexual harassment and deciding what corrective action to take.  When he asked what she wanted him to do, she replied: "I don't know what to do. That's why I'm here."  App. 146-47.

---

1.  That related case was initiated by other former employees of the Allegheny County Department of Development who were discharged when their positions were eliminated at the same time as Azzaro's.  These other employees claimed that their discharges were impermissibly in retaliation for their support of Joe Brimmeier, an anti-Foerster candidate for prothonotary.  See Carver v. Foerster, 102 F.3d 96 (3d Cir. 1996).

Sirabella allegedly replied, "[L]et's leave it alone for now ...." App. 147. Azzaro testified that she did not ask Sirabella to keep their conversation confidential. According to Sirabella, however, Azzaro asked him to keep the content of their conversation confidential. Mr. Azzaro, who attended the meeting with Sirabella, also indicated that he thought his wife told Sirabella that "she'd prefer him to keep it confidential." App. 225. Sirabella did not take any action.

That evening, Donna Brusco phoned Azzaro at home. She had spoken to Fusaro about the incident in Commissioner Foerster's office. Brusco told Azzaro that Joe Hohman had been in Commissioner Foerster's office that day, that he had been "extremely upset," and that he "was screaming at Commissioner Foerster that Wayne [Fusaro] was a pervert." App. 168. Brusco said that Fusaro had been too upset to tell her all the details. She then asked Azzaro why she had gone to see Sirabella that day. Subsequently, Fusaro asked Sirabella "three or four times" what the purpose of Azzaro's visit had been. App. 172.

Azzaro alleges that she was fired in retaliation for her reporting of the Fusaro incident. According to Azzaro, this retaliation was initiated by Fusaro and Brusco. Fusaro began by calling Don Kovac, who was the Director of Employee Relations during the relevant time period and was responsible for coordinating personnel activity for all County employees. Fusaro told Kovac that he suspected that the Department of Development, where Azzaro worked, had employees on the payroll who were disloyal to Commissioner Foerster. He asked Kovac to allow Donna

7

Brusco and another member of the Employee Relations Department to "review the entire payroll in the Department of Development to pick out people that were loyal to Foerster and people that were loyal to Brimmeier," who was Foerster's opponent. App. 417. Because Brusco had worked for the Department of Development until she was transferred to the Employee Relations Department at Fusaro's request in the fall of 1991, she was believed to be familiar with the entire Department of Development payroll and aware of people's loyalties. Fusaro told Kovac that he had authorization to compile the list from both Commissioner Foerster and Harry Kramer, Foerster's other executive assistant. Accordingly, Kovac granted his permission and appointed John Chapman, another employee of the Employee Relations Department, to assist Brusco.

Sometime between February and April 1992, Chapman and Brusco reviewed the list of Department of Development employees in accordance with Fusaro's request. As they did so, Brusco identified certain names as pro-Foerster or anti-Foerster. Azzaro alleges that the list of anti-Foerster names was a "hit list" and that she was a target. Indeed, Chapman testified that he had heard Fusaro say on more than one occasion that Brimmeier supporters would be "retaliated against." App. 273. When Chapman and Brusco reached Azzaro's name, according to Chapman, Brusco said, "We're going to get this bitch." App. 279.

Meanwhile, in March 1992, George Braun replaced Hohman as Director of the Department of Development. Braun caused the Department of Development to enter into an agreement with the

8

federal Department of Housing and Urban Development (HUD) which required the County department to spend less than the permitted amount on administrative expenses for three years, to offset excess administrative expenses incurred in prior years. Braun pursued this agreement in response to a HUD directive requiring the department to reduce the portion of its budget dedicated to administrative expenses by two or three percent in order to retain its federal funding. While this same federal directive had been in place during Hohman's tenure as Director of the Department of Development, Hohman had not taken steps to address it because he believed the problem would correct itself over time.

Braun also drafted a proposal to reorganize the department by, among other things, merging several divisions and eliminating the Marketing Division, in which Azzaro worked. Under the heading "Positions to be Terminated," the proposal specifically named Azzaro and Tom Fox, the supervisor to whom she had first reported the harassment incident, along with two employees whose pensions had already vested. App. 31. At the same time, the proposal recommended hiring nine new employees and increasing the salaries of eight others.

Braun submitted this proposal to Commissioner Foerster's office, which approved it and passed it on to the Salary Board. On June 18, 1992, the Salary Board approved the proposed restructuring of the Department of Development. The following day Braun told Azzaro that her position would be eliminated as of August 1 due to budgetary reasons unrelated to

9

her job performance.  No effort was made to find another position for Azzaro with the County government.

In September, 1993, Azzaro filed this suit against the County of Allegheny, Commissioner Tom Foerster, and Wayne Fusaro.  The complaint alleges retaliatory discharge against Allegheny County in violation of 42 U.S.C. § 2000(e); asserts a claim against all defendants under 42 U.S.C. § 1983 for infringement of Azzaro's First Amendment rights; and alleges violations of the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 955(a), (d) & (e), against Allegheny County.  Defendants filed a joint motion for summary judgment which the district court granted, deciding the two federal claims on the merits and declining to exercise supplemental jurisdiction over plaintiff's state-law claims.  We exercise plenary review over the district court's decision to grant summary judgment.  Commercial Union Ins. Co. v. Bituminous Cas. Corp., 851 F.2d 98, 100 (3d Cir. 1988).

                                    II.

        Azzaro alleges that the County violated Title VII by
discharging her in retaliation for her reports of sexual
harassment.  To establish a prima facie case of retaliatory
firing in violation of Title VII of the Civil Rights Act of 1964,
42 U.S.C. § 2000(e), a plaintiff must establish that (1) she
engaged in a protected activity;  (2) she was discharged after or
contemporaneously with that activity;  and (3) there was a causal
link between the protected activity and the firing.  Quiroga v.
Hasbro, Inc., 934 F.2d 497, 501 (3d Cir. 1991).  In this case,
the district court concluded that Azzaro had failed to bring
forward any competent evidence of a causal connection between her
allegations of sexual harassment and her discharge, and therefore
granted summary judgment in favor of defendants.  Azzaro v.
County of Allegheny et al., No. 93-1589, slip op. at 19 (W.D. Pa.
Mar. 31, 1995).  Specifically, the court found "no competent
evidence that those persons involved in the decision to
reorganize the [Department of Development] were aware of the
alleged sexual harassment prior to the approval of the
reorganization."  Id.

        We disagree.  While it is true that Foerster, Kramer,
and Braun have denied having knowledge of the alleged sexual
harassment prior to the termination, and while there is no
evidence that the members of the Salary Board other than Foerster
had such knowledge at the time of the Board's action, the
district court's conclusion overlooks a great deal of direct and
circumstantial evidence favoring Azzaro's position.  That

                                    11

evidence would support an inference that Foerster, Kramer, Fusaro, and Braun, with knowledge of the harassment incident and of Azzaro's reports, agreed to "get" her, and that they included a minor provision in the reorganization to accomplish this objective covertly, securing the routine approval of an unsuspecting Salary Board which cared about nothing more than that Foerster had approved the reorganization and that it would save the County money.

First, Azzaro produced evidence showing that Hohman stated at a meeting with Foerster, Fusaro, and Kramer that Fusaro sexually harassed a Department of Development employee who had come to see him in connection with summer jobs for her daughters. As both Fusaro and Kramer had been informed of the incident with Azzaro's husband and had been involved in resolving the dispute, Hohman's statement is sufficient to support a finding that Fusaro and Kramer knew of Azzaro's allegations. Moreover, since Fusaro and Kramer were close personal advisors of Foerster and since Foerster was present at the meeting with Hohman, a reasonable jury could find that it is more probable than not that Foerster, too, knew, as of the day of the meeting or shortly thereafter, that Azzaro was the employee in question.

There is further evidence that Fusaro, with the authorization of Foerster, thereafter caused a "hit list" to be prepared and Azzaro's name to be included on that list. There is no evidence suggesting any reason for Azzaro's inclusion other than her reporting the sexual harassment allegation to Fox and

12

Sirabella.[2]  Other evidence indicated that Braun, a new member of the Foerster team, conferred frequently with Fusaro and Kramer during the period in which the "hit list" and the "reorganization" were being prepared.  Even if he did not himself know of Azzaro's allegations against Fusaro, a reasonable juror could infer that Braun knew Azzaro was for some reason on a "hit list," and that he sought to aid the efforts to "get" Azzaro by including her discharge as part of his reorganization plan.

It is true, as defendants point out, that these individuals could not implement the reorganization plan themselves.  To discharge Azzaro in this manner, it was necessary to obtain the approval of the Salary Board.  While there is no evidence that a majority of the Board's voting members had actual knowledge of Azzaro's reports when they approved the reorganization, this does not preclude Azzaro from recovering on her Title VII retaliation claim.  See generally Bartholomew v. Fischl, 782 F.2d 1148, 1153 (3d Cir. 1986) (holding that plaintiff may state claim of constitutional deprivation against city by alleging that mayor, who was powerless to discharge plaintiff, persuaded city council to eliminate plaintiff's position).  To hold otherwise would be to grant public officials carte blanche to retaliate against employees as long as the retaliation is formally effectuated by the "rubber stamp"

---

2.  In particular, there is no evidence in the record that Azzaro was placed on the list because she was, or was perceived to be, a supporter of Joe Brimmeier and therefore disloyal to Foerster.  See supra note 1.

13

approval of another public agent. Title VII's prohibitions cannot be so easily evaded.

There is evidence from which a reasonable juror could conclude that it is a routine matter for the Salary Board to approve, with little or no discussion, proposals which purport to save the County money. During his deposition, Commissioner Foerster gave the following testimony concerning the Salary Board proceedings:

Q. Who sits on the Salary Board?

A. Three Commissioners and the Controller.

Q. From looking at that document, do you have any way of telling what the vote was to approve Braun's request?

A. I would have to check the minutes to make sure that it was approved. I would have no reason to vote against it, because I note the annual net savings of the Salary Board was $39,000.

Q. At the time the request for Salary Board action was presented, was there a discussion among the Commissioners and the Controller concerning the request, that you recall?

A. No, I do not.

                *    *    *    *

Q. At the Salary Board meeting itself, are there typically discussions within that Salary Board meeting about the pros and cons of the proposals that come to the Salary Board or are they just routinely approved?

A. If there is any questions [sic] by the Salary Board, they're asked at the Salary Board meeting. Otherwise they're routinely approved. Especially those requests for Salary Boards that indicate a savings of money.

App. 300-01.

14

Also significant in the context of the causation issue is the apparent fact that no one else in the recent history of the County had been terminated in the way Azzaro was discharged. Although the County had frequently eliminated vacant positions in the past, only once in the preceding fourteen years had it eliminated positions occupied by an incumbent -- and those jobs, unlike Azzaro's, had been designated from the outset as temporary positions. Moreover, the Department of Employee Relations had, as its director testified, "made every attempt to place" the displaced employees in new positions for the County. App. 407. In Azzaro's case, by contrast, no attempt was made to retain her as a County employee, notwithstanding the fact that there were hundreds of unfilled County positions available at the time of her discharge.

Additionally, Azzaro tendered evidence from which it could be inferred that the reason given by Braun for her discharge was pretextual and, accordingly, that the reorganization plan was simply a cover for an illicit motive. There is substantial evidence in the record indicating that, contrary to the County's contention, budgetary constraints did not compel Azzaro's discharge. That evidence indicated that the administrative cost overrun could have been corrected by attrition, without layoffs; that the reorganization plan which resulted in Azzaro's termination also recommended nine new hires and eight salary increases; that drastic measures were not necessary because the Department had four years to solve the

15

budget problem; and that the problem was ultimately fully addressed by the end of 1992, two years earlier than was required.  Based on all of the evidence, we believe a jury could reasonably find that Azzaro's termination was not necessary to bring the County into compliance with the HUD directive.

We thus conclude that granting summary judgment for the County on Azzaro's Title VII claim was inappropriate.

### III.

In addition to her retaliatory discharge claim against her employer under Title VII, Azzaro asserts a retaliatory discharge claim against all of the defendants under § 1983. Specifically, she alleges that the defendants, acting under color of state law, violated her rights under the First Amendment by discharging her in retaliation for her reports to Fox and Sirabella.  We conclude that summary judgment was erroneously granted on this claim as well.

We must first inquire whether Azzaro's reports to Fox and Sirabella were protected by the First Amendment.  This is a question of law.  See Watters v. City of Philadelphia, 55 F.3d 886, 892 (3d Cir. 1995).  We must then determine whether the record reflects a material dispute of fact on two factual issues: whether those reports were a motivating factor in the decision to discharge Azzaro and whether Azzaro would have been discharged for other reasons even in the absence of those reports.  See id.

### A.

16

Our analysis for determining whether Azzaro's sexual harassment reports were protected by the First Amendment is dictated by Connick v. Myers, 461 U.S. 138 (1983). There the Supreme Court held that the expressive rights of public employees are more restricted than those of public citizens who are not in an employment relationship with the government. Therefore, a discharged public employee cannot receive redress in a § 1983 action simply by showing that the same speech would be protected from government sanction were it to be engaged in by a non-employee citizen.

The facts of Connick can be succinctly stated. Myers, an Assistant District Attorney, was very unhappy about the District Attorney's decision to transfer her to a different division of the criminal court. In the course of her discussion with her superior about the impending transfer, she complained about other conditions in the office. When he responded that he did not think her grievances were shared by others, Myers decided to draft and circulate a questionnaire among her peers. The questionnaire inquired of the respondents, inter alia, what they thought of the trustworthiness of named superiors and the current state of morale in the office. It also inquired about whether they had ever been pressured to participate in political campaigns. Myers was then discharged for her distribution of the questionnaire, which she claimed violated her First Amendment right to free speech.

The Connick Court began its analysis of Myers' claim with an historical note:

> For most of this century, the unchallenged dogma was that a public employee had no right to object to conditions placed upon the terms of employment -- including those which restricted the exercise of constitutional rights. The classic formulation of this position was that of Justice Holmes, who, when sitting on the Supreme Judicial Court of Massachusetts, observed: "[A policeman] may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." McAuliffe v. Mayor of New Bedford, 155 Mass. 216, 220, 29 N.E. 517 (1892).

Connick, 461 U.S. at 143-44. The Court hastened to add, however, that subsequent cases had accorded public employees some protection against adverse employment actions based on expressive activity. Relying primarily on Pickering v. Board of Educ., 391 U.S. 563 (1968), and its progeny, the Court held that a public employee's expressive conduct is constitutionally protected only when two conditions are satisfied. First, the employee's conduct must address a "matter of public concern," which is to be determined by the "content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48. Second, the value of that expression must outweigh "the government's interest in the effective and efficient fulfillment of its responsibilities to the public." Id. at 150. A discharged public employee is entitled to no redress if her expression is not related to a matter of public concern or, even if it is so related, if its value is outweighed by the value of permitting the government to take action promoting efficiency and effectiveness.

18

Applying this analysis to the facts before it, the Court found that most of Myers' speech was unprotected. Her questions about the trustworthiness of the supervising attorneys and the morale in the District Attorney's office were not related to matters of public concern, and, therefore, were not protected by the First Amendment. In the context of a disgruntled employee who was only seeking "to gather ammunition for another round of controversy with her superiors," id. at 148, Myers' questions about trustworthiness and morale were not communications in which the community would have a significant interest. By contrast, however, her suggestion that there might be pressure from superiors in the office to participate in political campaigns was found to be a matter of public concern.

After Connick, then, the expressive rights of public employees are not as expansive as those of citizens outside the public work force. "[T]he government's role as employer . . . gives it a freer hand in regulating the speech of its employees than it has in regulating the speech of the public at large . . . ." Waters v. Churchill, 511 U.S. 661, ___, 114 S. Ct. 1878, 1886 (1994) (plurality opinion). Only a subset of speech that is protected for citizens is also protected for public employees: i.e. public concern speech.[3]

---

3. This is what the Court meant when it observed in Connick that a public employee's speech, even if not touching upon a matter of public concern, may be entitled to some protection under the First Amendment. 461 U.S. at 147. Speech unrelated to a matter of public concern is not, like obscenity, entirely outside the protection of the First Amendment. While the government as employer may discharge a public employee for such speech, the government as sovereign may not sanction the same individual when

To understand what is meant by "public concern" speech, it is crucial to understand the Court's justification for distinguishing between speech relating to matters of public concern and speech not relating to such matters. As the Court explained it:

The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Roth v. United States, 354 U.S. 476, 484 (1957); New York Times Co. v. Sullivan, 376 U.S. 254, 269 (1964). "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." Garrison v. Louisiana, 379 U.S. 64, 74-75 (1964). Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the "'highest rung of the heirarchy [sic] of First Amendment values,'" and is entitled to special protection.

Connick, 461 U.S. at 145. It is the value of exchanges of information and ideas relevant to self-governance that entitles public concern speech to "special protection."

It was for this reason that the Court, in delineating the expressive rights of public employees, chose to draw the line at speech related to matters of public concern. Silencing a public employee seeking to speak on a matter of public concern deprives a self-governing society of information that may be vital to informed decision-making. See Pickering, 391 U.S. at 571-72 (depriving community of teachers' opinions on how school funds should be allotted seriously hinders free and open debate and is inconsistent with intent of First Amendment); Watters, 55

(..continued)
she engages in such speech as a citizen, outside the employment context.

20

F.3d at 886 (finding former police department employee's statements about employee assistance program to be public concern speech, because public had significant interest in learning about problems which might impair effective operation of program). This can be a particularly serious loss because public employees, by virtue of their constant interactions with a public office, are often in the best position to know what ails that office. See Board of County Comm'rs v. Umbehr, __ U.S. __, 116 S. Ct. 2342, 2347 (1996).

Given that the basis for the special protection accorded public concern speech is its instrumental value to the community in enabling self-governance, a court asked whether a public employee's speech relates to a matter of public concern must determine whether expression of the kind at issue is of value to the process of self-governance. This task does not, of course, involve the court's passing judgment on the merit of the view expressed or its source. Rather, the issue is whether it is important to the process of self-governance that communications on this topic, in this form and in this context, take place.

This point is well illustrated by the Supreme Court's subsequent decision in Rankin v. McPherson, 483 U.S. 378 (1987). There, a clerical employee of a constable's office, after hearing a news report of an attempt to assassinate the President, said to a co-worker in what she thought to be a private conversation, "'If they go for him again, I hope they get him.'" Id. at 380. This remark was reported to her supervisor and she was discharged. While acknowledging that the employee's opinion

21

might understandably be regarded by some as ill-considered, the Court concluded that her statement could nevertheless be "'fairly characterized as constituting speech on a matter of public concern.'" Id. at 384 (quoting Connick, 461 U.S. at 146). As the Court explained:

> Considering the statement in context, as Connick requires, discloses that it plainly dealt with a matter of public concern. The statement was made in the course of a conversation addressing the policies of the President's administration. It came on the heels of a news bulletin regarding what is certainly a matter of heightened public attention: an attempt on the life of the President. . . . The inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern. "[D]ebate on public issues should be uninhibited, robust, and wide-open, and . . . may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964); see also Bond v. Floyd, 385 U.S. 116, 136 (1966): "Just as erroneous statements must be protected to give freedom of expression the breathing space it needs to survive, so statements criticizing public policy and the implementation of it must be similarly protected."

Id. at 386-87 (footnote omitted.)

Connick teaches a number of other lessons that are useful when applying its holding to new situations. First, Connick expressly recognizes that the community's interest in the free exchange of information and ideas relating to matters of public concern is not limited to public declarations. That interest is implicated in private exchanges between two individuals as well as in exchanges between an individual and

22

members of the public.  Private dissemination of information and ideas can be as important to effective self-governance as public speeches.  Thus, if the content and circumstances of a private communication are such that the message conveyed would be relevant to the process of self-governance if disseminated to the community, that communication is public concern speech even though it occurred in a private context.  Connick, 461 U.S. at 146, 148; see also Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410, 415-16 (1979) ("Neither the [First] Amendment itself nor our decisions indicate that [the] freedom [of speech] is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public.").

Second, Connick contains helpful lessons concerning the kinds of subject matter that are likely to be of public concern.  Racial discrimination in the assignment of school personnel, the subject matter of the private communication in Givhan, 439 U.S. at 410, was characterized by the Connick Court as "a matter inherently of public concern."  461 U.S. at 148 n.8.  The Court also suggested that a communication would be of public concern, barring a form or context that detracted from its value to the process of self-governance, if it (1) indicated "that the District Attorney's office was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases," or (2) brought "to light actual or potential wrongdoing or breach of public trust on the part of [the District Attorney] and others" that would be relevant in evaluating the performance

23

of a public office or official.  Id. at 148; see also Swineford v. Snyder County Pennsylvania, 15 F.3d 1258, 1271 (3d Cir. 1994) (allegation of malfeasance by election officials is speech "fall[ing] squarely within the core public speech delineated in Connick").

Finally, Connick indicates that the speaker's motive, while often a relevant part of the context of the speech, is not dispositive in determining whether a particular statement relates to a matter of public concern.  Myers' motive for devising and distributing her questionnaire was to defeat the proposed transfer.  Despite this same motive underlying all of her questions, the Court found that some of them related to matters of public concern and some did not.  If motive were dispositive, the inquiry could only have resulted in finding either that all of Myers' speech was public concern speech or that none of it was.  See also Rode v. Dellarciprete, 845 F.2d 1195, 1201 (3d Cir. 1988) (explaining that "motivation [is] merely one factor to be considered, [and] not necessarily controlling, in assessing the character of the employee's speech").

With this background, we now turn to an application of the governing law to the facts of this case.  The subject matter of Azzaro's reports to Fox and Sirabella was an incident of sexual harassment by an assistant to the Commissioner which occurred in the Commissioner's office during the course of an appointment Azzaro had made, in her capacity as the spouse of an employee, to plead for her husband's job.  The harassment was a form of gender discrimination since Fusaro presumably would not

24

have behaved in the same manner toward a supplicant male spouse of a female employee.  We believe this form of discrimination, when practiced by those exercising authority in the name of a public official, is as much a matter of public concern as racial discrimination practiced under similar circumstances.  We also believe that Azzaro's communications to Fox and Sirabella brought to light actual wrongdoing on the part of one exercising public authority that would be relevant to the electorate's evaluation of the performance of the office of an elected official.[4]  For these reasons, we conclude Azzaro's communications should be regarded as a matter of public concern unless something in their form or context deprived them of their value to the process of self-governance.

Turning to form and context, we find nothing that detracts significantly from the value of these communications to the process of self-governance.  Based on her deposition, it is fair to say that Azzaro complained reluctantly, that her interest in each instance was in saving her job and that of her husband, and that she might have been content if the only relief she had received was protection from discharge.     But this, in our judgment, would not cause a citizen engaged in an evaluation of the Commissioner's office to disregard or discount her complaint.

---

4.  We are thus not here presented with a situation in which a public employee has filed a complaint about an isolated incident of what he or she perceived to be inappropriate conduct on the part of a non-supervisory co-worker.  While we express no opinion on such a situation, it would presumably be less important to an evaluation of the performance of the public office involved than the situation now before us.

Assessing content, form, and context, including Azzaro's motivation, we conclude that Azzaro's reports to Fox and Sirabella were matters of public concern.

In reaching this conclusion, we have considered several distinctions that other courts of appeals have found to be controlling on the issue of whether a public employee's speech is speech of public concern. Although in each instance we find relevance in the factor relied upon by our sister courts, we respectfully decline to give those factors controlling significance.

A distinction has been suggested between speech uttered by a public employee "as an employee" and speech uttered by a public employee "as a citizen."[5]  See, e.g., David v. City and County of Denver, 101 F.3d 1344, 1355 (10th Cir. 1996) (stating that this distinction is "the fundamental inquiry" in deciding whether speech involves matter of public concern). An employee

_____

5.  The apparent origin of this distinction is the following language from Connick:

We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

461 U.S. at 147.  In context, however, we believe this sentence was intended to contrast "matters of public concern" with "matters only of personal interest" and not to suggest a critical distinction based on the subjective motivation of the employee. As we point out in text, the latter interpretation is inconsistent with the holding in the case.

speaks as an "employee," it is said, when her primary purpose is to secure relief for herself, and as a "citizen" only when her primary purpose is to bring about systemic reform. See id. at 1356. Under this view, if the employee's purpose was primarily to solve her own personal problem, the fact that her statement would be of value to the process of self-governance does not make the speech public concern speech. See, e.g., Morgan v. Ford, 6 F.3d 750, 754 (11th Cir. 1993).

The distinction between speaking as a citizen and speaking as an employee, then, is simply an alternative way of describing the inquiry into the speaker's motive. While, as we have explained, an employee's motive may be relevant to whether speech is on a matter of public concern, giving controlling significance to "primary purpose" is inconsistent with the result in Connick. Myers' purpose in asking her question about pressure to participate in political campaigns was no different than her purpose in asking her questions on the same questionnaire about office morale and the general reputation of the office supervisors for trustworthiness. Her purpose with respect to each of these questions was clearly "to gather ammunition for another round of controversy with her superiors." 461 U.S. at 148. Nevertheless, the question regarding pressure to campaign was speech about a matter of public concern because, even taking into account its form and context, it was important to a self-governing society that public employees be free to express themselves about it. As the Court explained:

[T]here is a demonstrated interest in this country that
                government service should depend upon

27

> meritorious performance rather than political service. Given this history, we believe it apparent that the issue of whether assistant district attorneys are pressured to work in political campaigns is <u>a matter of interest to the community upon which it is essential that public employees be able to speak out freely without fear of retaliatory dismissal</u>.

<u>Id.</u> at 149 (emphasis added) (citations omitted).

A related distinction has been suggested between situations in which the employee is seeking to bring information to the attention of the public and those in which the employee did not want her speech to be publicly circulated. Under this view, "oral statements [about sexual harassment] intended to be confidential" and to lead to the internal resolution of a problem without "public controversy" are not speech on a matter of public concern even though "incidences of sexual harassment in a public [institution] are inherently matters of public concern . . . ." <u>Callaway v. Hafeman</u>, 832 F.2d 414, 417 (7th Cir. 1987). Here again, although we think a request for confidentiality may be relevant to the public concern issue, we conclude that it would be inconsistent with <u>Connick</u> and <u>Givhan</u> to give it controlling significance.

A final, closely related distinction suggests that a grievance about sexual harassment is only a matter of public concern if it includes indications that there is a systemic problem interfering with the public agency's performance of its governmental functions, and not if the complaints relate solely to the employee's own situation. <u>See</u> <u>David</u>, 101 F.3d at 1356; <u>Saulpaugh v. Monroe Community Hosp.</u>, 4 F.3d 134, 143 (2d Cir.

28

1993).  In rejecting this notion, we do not suggest that all public employee complaints about sexual harassment are matters of public concern.  We do believe, however, that under all of the surrounding circumstances, Azzaro's reports address a matter of public concern even though they referred to a single incident.

B.

The next step in our analysis is to conduct the balancing of interests required by Pickering and Connick.  On one side we weigh the public employee's interest in speaking about a matter of public concern and the value to the community of her being free to speak on such matters.  See Green v. Philadelphia Housing Auth., 105 F.3d 882, 885 (3d Cir. 1997); Watters, 55 F.3d at 895; Versarge v. Township of Clinton New Jersey, 984 F.2d 1359, 1366 (3d Cir. 1993).  Balanced against these interests is the government's interest as an employer in promoting the efficiency of the services it performs through its employees. Watters, 55 F.3d at 895.  Only if the value of the speech, as measured by the employee's and the public's interests, is outweighed by the government's interest in effective and efficient provision of services, will we hold that the speech is unprotected.

Striking the appropriate balance in this case is not difficult.  It is true that Azzaro's revelations were apparently not about systemic gender discrimination, as were Ms. Givhan's complaints about racial discrimination.  Nevertheless, as we have explained, there is a substantial public interest in Azzaro's

29

revelations because they were relevant to an evaluation of the performance of the office of an elected official. We conclude that this public interest is clearly sufficient to outweigh any legitimate countervailing governmental interest that might have been implicated here, if any such interest there be.

Indeed, those governmental interests are negligible here. We fail to see how Azzaro's reports to Fox and Sirabella could have posed any threats to the government's interest in efficiency or effectiveness. She and Fusaro did not work in the same office, much less have an employment relationship requiring trust and confidence. By adopting a policy against sexual harassment and a process for reporting and dealing with it, Allegheny County had affirmatively recognized that complaints about sexual harassment were important to its ability to serve the public effectively and efficiently. This seems to us an acknowledgement on the part of Azzaro's employer that communications in the manner and place of hers do not pose an undue threat of disruption.[6]

It follows that the <u>Pickering</u> balance falls in Azzaro's favor.

### C.

_____

6. While Ms. Azzaro was harassed in her capacity as the spouse of an employee rather than in her capacity as an employee, her complaining to her supervisor and then to the Director of Administration in accordance with her employer's policy for handling employee complaints would not appear to have any greater propensity for disruption.

30

We conclude that Azzaro's speech is protected as a matter of law. Her reports of sexual harassment are related to a matter of public concern; and her interest in making such reports, combined with the value to the community of her being free to do so, outweighs the County's interest in preventing her from reporting such incidents. Therefore, Azzaro could not be discharged on the basis of this speech. See Swineford, 15 F.3d at 1270.

Based on the evidence we have reviewed in the context of Azzaro's Title VII claim, we also conclude that there is a material dispute of fact as to whether her reports were a motivating factor in the discharge decision. Finally, we determine that the district court's summary judgment in favor of the defendants cannot be sustained on the ground that uncontroverted evidence establishes that Azzaro's termination would have occurred in any event for reasons other than those reports. A trier of fact could conclude from this record that Azzaro would not have been discharged in the absence of her reports of sexual harassment. Accordingly, we hold that summary judgment in favor of the defendants on the § 1983 claim was erroneously entered.

IV.

In light of our ruling on Azzaro's Title VII and § 1983 claims, we will also reverse the district court's dismissal of her Pennsylvania Human Relations Act claim. The district court

should exercise supplemental jurisdiction over this claim.  <u>See</u>
28 U.S.C. § 1367(a).

V.

For the foregoing reasons, we will reverse the district
court's order granting summary judgment to the defendants and
will remand for further proceedings consistent with this opinion.

32

BECKER, J., concurring.

I join in the majority's opinion with the understanding that, under its rendering of Connick v. Myers, 461 U.S. 138 (1983), in part III, it has not created anything close to a per se rule under which reports of sexual harassment will always constitute public concern speech. It seems to me that there will be many complaints of sexual harassment, about more aggravated conduct than that described in footnote 4 of the opinion, which will not qualify as matters of public concern and with respect to which summary judgment for the defendant will be appropriate. This will include cases where the offender is a non-supervisory co-worker and the incident is more than "isolated," though neither egregious nor repeated with great frequency; where the incident is not known to the "powers that be"; where, even if a supervisor is involved, the incident is minor or questionable; where the motive or credibility of the complainant is significantly in doubt; or where a combination of these factors is at work. Under the majority's approach, the opposite result might attain, incorrectly I submit.

I am satisfied that the record in the case at bar supports the denial of summary judgment, though not by much. I

33

note in this regard Azzaro's delayed and offhand non-report to Fox which became a "report" to Sirabella only in the context of the political crossfire in which she became caught when Hohman sought to use her report to combat his dwindling influence with Foerster. Indeed, the record is far from clear that she was not targeted for dismissal because of possible support for Brimmeier, see Carver v. Foerster, 102 F.3d 96 (3d Cir. 1996), rather than her non-complaint of sexual harassment.

Judges Scirica, Roth and Alito join in this opinion.BEVERLY AZZARO v. COUNTY of ALLEGHENY, et al. No. 95-3253

ROSENN, Circuit Judge, dissenting.

I join in the majority opinion except as to Part III pertaining to the First Amendment issue. Although the evidence is tenuous, I agree that there are sufficient facts in dispute which, if the plaintiff's version is believed, could lead a reasonable factfinder to conclude that Allegheny County discharged her in retaliation for her accounts of harassment. Summary judgment on her Title VII claim, therefore, was inappropriate. However, I do not agree with the majority that the evidence was sufficient to conclude that the plaintiff's speech was a matter of public concern and therefore protected by

the First Amendment.  Thus, I would affirm the grant of summary judgment on her § 1983 claim.

I do not regard the First Amendment to be of lesser importance than does the majority.  I believe, however, that Azzaro's conversation with Fox at a social party and her meeting with Sirabella for advice or assistance in connection with the potential termination of her position did not constitute matters of public concern that command First Amendment protection.  I fear that the majority's expansion of protected speech for public employees not only is contrary to the decisions of the Supreme Court and our sister courts, but has the dangerous effect of elevating personal and confidential conversation, which in form, content, and context is not of public concern, to the level of constitutionally protected speech.  The consequence may seriously impede normal discourse and create management problems in the public workplace.  I, therefore, respectfully dissent from Part III of the majority opinion.

I.

Not all speech is protected by the First Amendment and "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." Pickering v. Board of Educ., 391 U.S. 563, 568 (1968).  This is not to say that a public employee, like any citizen, may not have a legitimate interest in speech on public matters.  But as Justice O'Connor recently observed in writing

35

the plurality opinion for the Supreme Court of the United States, "even many of the most fundamental maxims of our First Amendment jurisprudence cannot reasonably be applied to speech by government employees." Waters v. Churchill, 511 U.S. 661, 672 (1994).

Justice O'Connor further noted that the Court has recognized that a government employer has a certain latitude in barring its employees from offensive utterances to the public and in curbing speech that creates disruption, disorder, or confusion among employees in the workplace. "Similarly, we have refrained from intervening in government employer decisions that are based on speech that is of entirely private concern." Id. at 674. See also Connick v. Myers, 461 U.S. 138, 146-49 (1983). And the presence of sexual content is not sufficient in itself to make private speech a matter of public concern.

In Pickering, the Supreme Court set forth a framework for analyzing a claim of a First Amendment violation brought by a public employee disciplined because of speech. The Court declared that employees had a First Amendment right to speak on issues of public concern. There, a teacher wrote a letter to a local newspaper in connection with a proposed tax increase by the school board in which he criticized past proposals to raise new revenue for the schools. He also criticized the priority of school sports, the neglect of the deteriorating physical condition of school buildings, and the insufficient appropriation for teachers' salaries. Whether a school system requires additional funds and their alleged profligate use is a matter of

legitimate concern for the community as a whole and "[o]n such a question free and open debate is vital to informed decision-making by the electorate. . . . Accordingly, it is essential that [teachers] be able to speak out freely on such questions without fear of retaliatory dismissal." Pickering, 391 U.S. at 571-72.

II.

In explicating its earlier decision in Pickering and analyzing the specific problem then before it, the Court in Connick again considered the First Amendment right of an employee to freedom of speech and the State's interest as an employer "in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568. In returning to the public employee-employer balancing problem raised earlier in Pickering, the Court recognized the First Amendment rights of public employees but at the same time demonstrated its concern for the public employer's responsibility to manage efficiently its operations and fulfill its public obligations. The Court noted that the reiteration in Pickering's progeny of the right of a public employee to comment "as a citizen" upon matters of public concern at the same time reflects "the common-sense realization that government offices could not function if every employment decision became a constitutional matter." Connick, 461 U.S. at 143 (footnote omitted).

37

Therefore, the Connick Court in determining that most of Myers' questionnaire could not be fairly characterized as constituting speech on a matter of public concern stated:

> When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment.

Id. at 146.

This court also has previously noted that speech is a matter of public concern when it fairly can be considered as relating to any matter of political, social or other concern to the community. Swineford v. Snyder County, 15 F.3d 1258, 1270-71 (3d Cir. 1994); Holder v. City of Allentown, 987 F.2d 188, 195 (3d Cir. 1993). In some situations, speech pertaining to sexual harassment may be a matter of community concern and thus implicate the First Amendment. In other situations, it may be simply a matter of private concern. See David v. City & County of Denver, 101 F.3d 1344, 1357 (10th Cir. 1996).

This case bears a similarity to Saulpaugh v. Monroe Community Hosp., 4 F.3d 134 (2d Cir. 1993). There, a public hospital employee sued her employer under Title VII and alleged a First Amendment claim under § 1983, as well as state law claims. The plaintiff testified that immediately after she was hired her supervisor sexually harassed her, including making threats of discharge, and ultimately terminated her for resisting his proposals. The district court found the employer liable under

38

Title VII based on sexual harassment and retaliatory discharge but dismissed the First Amendment claim because plaintiff's complaints were personal in nature and generally did not implicate matters of public concern.  They did not involve a debate on issues of sex discrimination, and her suit did not seek "`relief against pervasive or systemic misconduct by a public agency or public officials,'" nor was her suit "`part of an overall effort . . . to correct allegedly unlawful practices or bring them to public attention.'"  Id. at 143 (quoting Yatvin v. Madison Metro. Sch. Dist., 840 F.2d 412, 420 (7th Cir. 1988)).

The majority concludes that Azzaro's conversations with Fox and Sirabella constituted protected speech under the First Amendment.  I believe that a careful analysis of the form, content and context of these two conversations concerning a single incident will show that these conversations did not involve matters of public concern.  In fact, the entire record shows a pervasive desire by Azzaro not to "go public," and although she claims she initially discussed the incident at times with her friends, it was always with an attitude of *entre nous*. The form of her communications with both Fox and Sirabella were not in the nature of complaints or formal reports, either oral or written.

The context of Azzaro's communications with her supervisor, Tom Fox, was at a private party at the home of a friend who was not a county employee.  As to the content, they were discussing the Anita Hill hearings, and Azzaro told of her alleged incident with Fusaro to defend her position with respect

39

to Hill.  The time was four months after the alleged Fusaro incident.  The timing, the social setting, the content, and the context of this conversation were unequivocally personal and social.  Moreover, when Fox attempted to convince Azzaro to take the matter up with her supervisor, she refused.  Concerned with the potential danger to her job, she continued to refuse until Fox, against her wishes, reported the incident.

As for her conversation with Sal Sirabella, the Director of Administration, Azzaro acknowledges that this conversation also was of a personal nature.  She did not communicate with Sirabella to complain or officially report the alleged harassment.  Rather, she approached him several months after the alleged incident to seek personal advice on how to avoid losing her job.

In neither Azzaro's conversation with Fox or with Sirabella was there any debate or even implication concerning sexual policies or practices in the Allegheny County Department of Development where she was employed.  She did not complain of any personal or systemic misconduct by her department or officials in her department.  Although the majority describes her conversations with Fox and Sirabella as "reports," she made no complaints whatsoever to Fox or even Sirabella, either written or oral, nor did she submit any formal written statement to Fox or any other supervisor in her department.

In context, it is apparent that Azzaro's statements were only tangentially about her alleged experience with Fusaro, and in no way focused on harassment as a matter of public

40

concern. Uppermost in her mind was her concern for her job. Her speech utterly lacked political content, the protection of which was foremost in the minds of the framers of the First Amendment, or any element of social advocacy. The First Amendment was designed by its framers "`to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" Connick, 461 U.S. at 145 (quoting Roth v. United States, 354 U.S. 476, 484 (1957)).

Azzaro's speech added nothing to improve the administration of the government of Allegheny County. Her speech made no effort to improve working conditions for her fellow employees, nor did it attempt to evaluate the performance of her department or the county. The Court in Connick rejected most of Myer's questionnaire as not being an expression of public import in evaluating her employer's performance as an elected prosecutor, noting:

Myers did not seek to inform the public that the District Attorney's Office was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases. Nor did Myers seek to bring to light actual or potential wrongdoing or breach of public trust on the part of Connick and others. . . . While discipline and morale in the workplace are related to an agency's efficient performance of its duties, the focus of Myer's questions is not to evaluate the performance of the office but to gather ammunition for another round of controversy with her superiors.

41

<u>Id.</u> at 148. The purpose of Azzaro's speech, her general conduct with her employer, and her legal action concerned only herself and keeping, as she testified, her job. She had no intention to make her communications with Fox or Sirabella public. Even if they had been released to the public, they would have revealed only an alleged single incident on the part of a single co-worker to sexually harass her.

The content of Azzaro's conversations with Fox and Sirabella made no effort to personally complain or publicly expose wrongful practices and objectionable policies on the part of her department or county officials. For over a year after the incident, she intermittently talked to her friends about the alleged Fusaro incident but deliberately avoided going public. She testified that she spoke to her personal friends:

> I told it just to get it out. I mean I was carrying it around all the time, and it was like a release when I told someone.

Azzaro Dep. at 114. However, she had no intention of publicizing the harassment, nor of warning other women of the danger of harassment. In fact, when one friend recommended that Azzaro file a complaint with the EEOC, she refused. Azzaro Dep. at 113. In content, in form and in context, the two conversations pertained to a private matter.

As in <u>Callaway v. Hafeman</u>, 832 F.2d 414 (7th Cir. 1987), the plaintiff's conversations were limited to "oral statements intended to be purely confidential," and were not for public information or debate. <u>Id.</u> at 417. She was not attempting to speak out as a citizen concerned with conditions or

42

problems confronting Allegheny County; "instead, she spoke as an employee attempting to resolve her private dilemma," id., even when she spoke to Sirabella and when she conversed with her friends.

In applying the law to the facts of this case, the majority asserts that the alleged Fusaro incident was a form of "gender discrimination" which "when practiced by those exercising authority in the name of a public official, is as much a matter of public concern as racial discrimination practiced under similar circumstances." Maj. op. at 27. But the issue before us is neither Fusaro's alleged behavior nor any gender discrimination by the County. The issue is whether, in addition to her Title VII claim for a retaliatory discharge, Azzaro has a First Amendment claim against the County based on her conversations with Fox and Sirabella.

Proceeding with its analysis, the majority speculatively infers that:
Azzaro's communications to Fox and Sirabella
> brought to light actual wrongdoing
> on the part of one exercising
> public authority that would be
> relevant to the electorate's
> evaluation of the performance of
> the office of an elected official.

Maj. op. at 27. However, Azzaro's conversations with Fox and Sirabella were intended for their ears only, and not the electorate. The record is also silent with respect to any knowledge on the part of the public of these conversations until, presumably, this lawsuit was filed. Additionally, there is no basis whatsoever for the majority's highly speculative conclusion

43

that these two confidential conversations pertaining to Fusaro would be relevant to the electorate's evaluation of the performance of Commissioner Foerster's office.

Recognizing the private nature of Azzaro's conversations, the majority cites Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410 (1979), and Connick, 461 U.S. at 146, 148, for the proposition that if the content of a private communication would be relevant to the process of self-governance if disseminated to the community, the communication is nonetheless public concern speech even though it occurred in a private context. Maj. op. at 25. This is correct if the content and circumstances involve a matter of public concern. However, private communication rather than public may be a factor for consideration in determining whether the content of the conversation is of public concern. Here, not only were the communications private and confidential, but the content personal. Moreover, as previously stated above, Azzaro made it clear that the conversations were not intended for public dissemination or for action by her employer. Therefore, they could have no relevance to any community evaluation of county government and their content could not be a matter of public concern because they related only to a single incident of personal behavior of a single fellow employee, not to the performance of any elected official.

In Givhan, the school district dismissed the plaintiff, a black junior high school English teacher, who sought reinstatement on the ground, inter alia, that her dismissal

44

infringed her right of free speech under the First and Fourteenth Amendments. The district court found that the primary reason for her dismissal "was her criticism of the policies and practices of the school district, especially the school to which she was assigned to teach." Id. at 413. Neither the Supreme Court nor the district court had difficulty in concluding that the content of the speech by Givhan focused on "the policies and practices of the school district." Azzaro's conversations only described Fusaro's conduct -- a single incident -- and had no reference whatsoever to policies, practices, or any wrongdoing of Allegheny County or its agencies. The content in Givhan indisputably was of public concern; Azzaro's content was not.

Givhan's communications to her superior, though private in nature, in no way limited their dissemination to the public. Azzaro did; she insisted on confidentiality. As the court recently iterated in Waters, 511 U.S. at 674, "we have refrained from intervening in government employer decisions that are based on speech that is of entirely private concern." Azzaro's conversations were entirely of private concern.

Thus, in David v. City & County of Denver, 101 F.3d 1344 (10th Cir. 1996), also a Title VII and § 1983 suit against county officials charging sexual harassment and retaliatory discharge for exercising the right of free speech, the district court held that the plaintiff's complaints about sexual harassment did not address matters of public concern. On appeal, the Court of Appeals distinguished between speech pertaining to a public agency's discharge of its governmental responsibilities

45

and speech relating to internal personnel disputes and working conditions.  It also considered the motive of the speaker to ascertain whether the speech was calculated to redress personal grievances, and therefore spoken as an employee, or to address a broader public concern, and therefore spoken as a citizen. David, 101 F.3d at 1355.  The court concluded that plaintiff's complaints to her supervisors and her letter focused  "on the conditions of her own employment" and in neither her EEOC complaints nor her letter to the City Attorney did she allege other employees had been subjected to harassment or that harassment or retaliation had interfered with the department's performance of its governmental responsibilities.  Id. at 1356.

Likewise, in Morgan v. Ford, 6 F.3d 750, 754 (11th Cir. 1993), the plaintiff left her job with the Georgia Department of Corrections because her supervisor subjected her to sexual harassment in the workplace.  The Court of Appeals in this case also affirmed the district court's grant of summary judgment for the supervisors.  Plaintiff did not relate her complaints to the public or attempt to involve the public.  Her "speech was driven by her own entirely rational self-interest in improving the conditions of her employment.  Her complaints about Ford's behavior, as serious as they were, centered around her private matters. . . .  As an employee grievance, Morgan's speech was not a matter of public concern."  6 F.3d at 755.


III.


46

I fear that the majority's extension today of the constitutional protection of free speech goes far beyond what the framers of the First Amendment envisioned. It will add to the manifold complications already existing in administering all types of government, especially sectors of government with a large number of employees as has Allegheny County, and enlarge needlessly its cost by the threat of mischievous litigation. We should not become entangled in every employment dispute merely because there are allegations of suppression of free speech. Callaway, 832 F.2d at 416. Azzaro has not produced sufficient evidence from which one can reasonably conclude that, in form, content, or context, her speech was a matter of any public concern.[7] Therefore, I respectfully dissent on the First Amendment issue.

---

[7]Because Azzaro has not shown that her conversations with Fox and Sirabella were matters of public concern, I do not deem it necessary to conduct a balancing of interests as required by Pickering and Connick, by weighing Azzaro's interest when speaking about a matter of public concern as against the government's interest in the efficient conduct of its operations and the effective services it performs.